150 N.J. Super. 32 (1977)
374 A.2d 1214
HENRY O. BOENNING, PLAINTIFF-RESPONDENT,
v.
THE BRICK TOWNSHIP MUNICIPAL UTILITIES AUTHORITY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1977.
Decided May 13, 1977.
*33 Before Judges HALPERN, BOTTER and DAVIDSON.
Mr. Charles E. Starkey argued the cause for appellant (Messrs. Starkey, Turnbach, White & Kelly, attorneys).
Mr. Edward Feurey argued the cause for respondent (Messrs. Paschon & Feurey, attorneys).
Messrs. Rosenberg & Waldman filed a brief for amicus curiae Utility Contractors Association of New Jersey, Inc. (Mr. Richard K. Rosenberg on the brief).
Messrs. Hiering, Grasso, Gelzer & Kelaher filed a brief for amicus curiae Ocean County Sewerage Authority (Mr. Richard H. Woods on the brief).
The opinion of the court was delivered by BOTTER, J.A.D.
The sole issue on this appeal is whether the Brick Township Municipal Utilities Authority (Authority) can legally establish minimum unit prices to be bid for certain items of work and materials of an indeterminate quantity which may be required in execution of contracts for the installation of a municipal sewerage collection system. The concepts involved are referred to as "unbalanced bids" and "pennying," that is, bidding nominal sums for certain items in public (and private) construction contracts. See Armaniaco v. Cresskill, 62 N.J. Super. 476 (App. Div. 1960); Frank Stamato & Co. v. New Brunswick, 20 N.J. Super. 340 (App. Div. 1952); Corbiscello Brothers, Inc. v. Fort Lee, 93 N.J. Super. 374 (Law Div. 1967); Phifer v. Bayonne, 105 N.J.L. 524 (Sup. Ct. 1929); Nelson v. New York City Mayor, 131 N.Y. 4, 29 N.E. 814 (Ct. App. 1892); New York Mayor v. Brady, 115 N.Y. 599, 22 N.E. 237 (Ct. App. 1889); Reilly v. *34 New York City Mayor, 111 N.Y. 473, 18 N.E. 623 (Ct. App. 1888); In Re Anderson, 109 N.Y. 554, 17 N.E. 209 (Ct. App. 1888); Abbett, Engineering Contracts and Specifications (4 ed. 1963) at 160-162; Cohen, Public Construction Contracts and the Law 53-56 (1961); Dunham & Young, Contracts, Specifications, and Law for Engineers (2 ed. 1971), at 262-264 and 271-272.
This case involves the solicitation of bids on Contracts S-5 and S-6 for the construction of a portion of the municipal sewerage system. The action was instituted in September 1975 by a property owner of Brick Township, Ocean County. The complaint asserted a violation of the Local Public Contracts Law, N.J.S.A. 40A:11-1 et seq. An order to show cause was issued with restraints to prevent the Authority from opening bids for the work and to allow contractors to withdraw bids previously submitted. After a hearing at which defendant's two expert witnesses testified, the trial judge held that fixing minimum unit prices that must be bid for certain items of work was inconsistent with the statutory goal of obtaining the lowest responsible bidder and was, therefore, illegal. A judgment was entered declaring the use of minimum price requirements unlawful as against public policy, restraining defendant from doing so in the future and allowing all bidders to withdraw their bids.
Although an appeal was filed, defendant was forced to readvertise and award the contracts in compliance with the trial judge's order because of time limits involved in the grant of Federal funding of the project.[1]
The Authority engaged the services of Charles J. Kupper, Inc. (Kupper) as consulting engineers for the design of the sewerage collection system and the preparation of *35 plans, specifications and contract documents. This firm was involved in the installation of sewers in Brick Township since 1963 or 1964. The bidding and contract documents prepared by Kupper required contractors to bid at least certain fixed or minimum unit prices for so-called "discretionary" items.
Discretionary items are distinguished from "certain" items by the fact that the nature and extent of "certain" items can be measured by reference to plans and specifications. An example of a "certain" item is sewer pipe, whose size and length are shown on the plans.
Discretionary items are types of work and material which cannot be accurately measured or ascertained, in terms of quantity or need, in advance of the work actually being performed. Here, these fell generally into two categories, one pertaining to underground work and the other to restoration work. The underground work entailed laying sewer pipe in trenches ranging generally from 6 to 20 feet deep. Although interval borings were used in designing the project, it was impossible to determine all soil conditions that would be encountered. Some soil conditions might require the use of stone and select material or concrete cradles to support the sewer pipe. Also, timber or steel sheeting left in place might be needed to shore up the trenches and protect the completed work. Some uncertainty also existed in regard to the extent of restoration work, such as asphalt paving or landscaping, that would be required after the sewers had been installed.
The term "discretionary" is used because the final determination of need must be made by the engineer on the site while the work is being performed. But, for the purpose of comparing competing bids, the engineers must estimate in advance the kind and extent of these discretionary items. They do so as best they can based upon the borings, their knowledge of local conditions and their experience in such projects.
*36 During the course of the work the judgment of the engineer, for example, as to the stability of soil conditions, may be questioned. A contractor who has "pennied" these indeterminate, discretionary items will be disinclined to accept the engineer's orders. That contractor will not want to incur the expense or loss in doing this work. As a result, according to the testimony, disputes will arise and will interfere with timely completion of the project.
Nevertheless, it is common practice in bidding for public and private utility contracts for contractors to bid a nominal sum or a penny for units of discretionary work. The Armaniaco case, supra 62 N.J. Super. at 480, shows the bid of one cent (or a total of $4.17) for units of timber sheeting left in place, whereas a second contractor bid $200 per unit for the same item, and, based on estimates, his total bid was $83,400 for that discretionary item. Similar examples are shown in other cases cited above.
How can a contractor bid one cent, or $4.17 in toto, for the estimated cost of this item while another estimates the cost to be $200 per unit and $83,400 in toto? One answer given in the testimony is that some contractors will gamble on this item. Another explanation may be a contractor's superior knowledge that the engineer has overestimated the need for such items. In such a case the public may not benefit, however, for the contractor who "pennies" the item and gains a competitive advantage can afford to increase his bid on "certain" items and thus obtain a windfall on those items. Another answer shown by the cases is collusion or fraud between the contractor and the engineer whose discretion will be invoked. Nelson v. New York City Mayor, supra, is an example of an unbalanced collusive bid where the contractor was called upon to perform the high-priced items but not the low-priced items. In re Anderson, supra, shows a bid by contractor Kane of $1.625 a cubic yard for earth excavation, loosely estimated by the engineer at 10,000 cubic yards in toto. Kane also bid two cents a cubic yard for rock excavation, whose total was loosely *37 estimated at 20,000 cubic yards. Using these estimates Kane was the low bidder at $17,100. To Kane's good fortune, when the job was performed 20,576 cubic yards of earth excavation were found, more than twice the estimated quantity, and only 9,241 cubic yards of rock excavation were found, less than one-half of the estimate. Therefore, Kane was paid $33,620, which was higher than all other bids but one, and roughly twice the amount of his bid based on estimates. The proofs showed that the fair price for rock excavation was $1.70 a cubic yard and for earth excavation 30 cents a cubic yard. In these circumstances the court said that the inference of fraud and collusion was inescapable. As we can see, the practice of "pennying" was in vogue as far back as the 1880s when that case was decided.
Another mode of unbalanced bidding is simply to increase the bid price for items of work to be performed first and decrease the bid on items to be performed at the conclusion of the job. This practice is discussed in the section entitled, "Preparation of a unit-price bid by a contractor," in Dunham and Young, Contracts, Specifications, and Law for Engineers, supra at 262-264, saying:
Notice that, in making the upward adjustments, the contractor has added relatively more to the items of work that will be performed early in the course of the contract then he has to those that will be done later. This is called making an unbalanced bid. There is nothing underhanded about it. By so doing, the contractor arranges matters so that partial payments made in the first few months will yield him a generous return so that he will not have to use as much of his own cash to finance the work.
Another type of unbalanced bid may be arrived at by bidding low on an item that the contractor thinks will underrun the quantities listed in the proposal form and by making a high bid on something that is likely to overrun the stated quantity. Remember that the contractor will be paid his bid price per unit times the number of units actually performed or furnished. Reasonable "unbalancing" is perfectly proper, but it represents something of a gamble by the contractor in most cases. [Italics the authors']
*38 The testimony reveals that to avoid penny or nominal bids on discretionary items, the practice of fixing minimum prices has been employed in the public utility field since the late 1960s. In Corbiscello Brothers, Inc. v. Fort Lee, supra, Judge Kole, then sitting in the Law Division, sua sponte raised the issue of the legality of minimum bid requirements under our bidding laws. He ordered a plenary trial on the issue, but its resolution has not been reported. We are advised that the records of the court show only that the case was dismissed by stipulation.
The expert testimony explained the purpose of calling for minimum bids. The actual minimum prices in this case were fixed below the estimated cost for each discretionary item, so in no case would a contractor reap a windfall if there is an overrun on any item. By using less than actual cost the minimum price allows for competition by responsible bidders. But the minimum also insures that a contractor who has bid the minimum price only will be paid at least part of his cost when the item must be performed. It minimizes gambling by contractors and the potential for disputes and even insolvency. In addition, it inhibits unbalanced bids by reducing the ability of a contractor to inflate the bid on work first to be performed. Thus, as the experts testified, minimum bid requirements serve the public interest as well as the interest of responsible bidders. One expert was Harry S. Allen, president of Kupper, the consulting engineers. The other was a contractor who was also president of the Utility Contractors Association of New Jersey, amicus curiae supporting appellant's position.
In response to these practical considerations plaintiff argues that the effect is to prevent the public from getting a competitively low bid. If contractors gamble and lose, the argument goes, there is always a bonding company to complete the job. Implicit is the conclusion that through "penny" bids the public will get something for nothing. There is good reason to doubt that conclusion.
*39 There is nothing in the Local Public Contracts Law that expressly permits or prohibits minimum bid requirements. The subject is not included in Local Public Contract Guidelines and Regulations adopted by the Local Finance Board of the Division of Local Finance, Department of Community Affairs, pursuant to N.J.S.A. 40A:11-37 and N.J.S.A. 52:27BB-32 et seq. Regulations governing change orders in the performance of local government contracts were adopted effective April 15, 1977. 9 N.J.R. 166(a). These regulations exclude purchase orders issued pursuant to open-end contracts. Nevertheless, some provisions deal with analogous problems. For example, N.J.A.C. 5:30-14.4(c)(3) provides that "Quantities of items or work shall not be changed in such a manner as to nullify the effect of the competitive determination of lowest responsible price which was made at the time of contract award * * *."
Frank Stamato & Co. v. New Brunswick, supra, held that an unbalanced bid (which involved "pennying" some items) can be lawfully accepted in the absence of collusion, fraud or abuse of discretion, even though the specifications provided: "Bids which are obviously unbalanced may be rejected." 20 N.J. Super. at 344. In Armaniaco v. Cresskill, supra, the specifications also provided that bids which are "obviously unbalanced" in the opinion of the engineer may be rejected. 62 N.J. Super. at 479. That case also involved a sewer project. The specifications called for unit price bids on 34 of 35 items of work. One item, rock excavation, was estimated to require the removal of 2,100 cubic yards for which a predetermined unit price of $20 a cubic yard was fixed by the borough. The evidence in the case showed that the price of rock excavation could vary from $10 to $28 a cubic yard. One of defendants' experts admitted that competitive bidding probably would have brought a price less than $20 a cubic yard. In these circumstances the court held that the provision for a set price for rock excavation was invalid.
*40 In the course of its opinion the court in Armaniaco stated that the borough could reserve the right to reject unbalanced bids. 62 N.J. Super. at 487. Concurring in the conclusion, Judge Conford wrote that nominal bids submitted by the successful bidder have the effect of eliminating a common standard of competition for the award as a whole, in violation of accepted principles of public bidding. 62 N.J. Super. at 487. See Camden Plaza Parking, Inc. v. Camden, 16 N.J. 150, 159 (1954). Judge Conford stated:
I am of the view, further, that to tolerate the result of the bidding in this case is to open the door to fraud and collusion * * *. [62 N.J. Super. at 487]
Judge Conford argued that the specifications called for unit bidding on all designated items and that the failure of a bidder to submit any bid at all on those items would require a rejection of the bid. He concluded that a nominal bid on such an item was a sham and amounts to a substantial failure to comply with bidding requirements. 62 N.J. Super. at 488, citing Hillside Tp. v. Sternin, 25 N.J. 317, 324-326 (1957).
Local government agencies have the right to invite bids on terms and conditions which do not stifle open, competitive bidding. In the case at hand the cost of performing the discretionary unit items was estimated at approximately 10% of the total cost of the contracts. Since penny or nominal unbalanced bids can be rejected, they may also be avoided by the use of minimum bid requirements. These requirements enhance the bidding process and may remove an inducement to fraud or collusion. In our view the requirements in this case did not violate the provisions of the Local Public Contracts Law and did not contravene public policy.
Reversed, without costs.
NOTES
[1] In these circumstances this court dismissed the appeal as moot, and defendant petitioned for certification. The petition was granted, and the Supreme Court summarily reversed the dismissal and remanded the appeal to this court for a determination on the merits. 72 N.J. 472 (1976).