761 A.2d 122 (2000)
335 N.J. Super. 130
M.J. PAQUET, INC., Plaintiff-Respondent,
v.
NEW JERSEY DEPARTMENT OF TRANSPORTATION, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 2000.
Decided November 15, 2000.
*123 Thomas H. Shar, Deputy Attorney General, argued the cause for appellant (John J. Farmer, Jr., Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Mr. Shar, on the brief).
Paul Z. Lewis, Saddle River, argued the cause for respondent (Lewis & McKenna, attorneys; Vittorio S. LaPira, of counsel; Mr. Lewis and Michael F. McKenna, on the brief).
Before Judges BAIME, WALLACE, and CARCHMAN.
The opinion of the court was delivered by BAIME, P.J.A.D.
This appeal involves arcane principles pertaining to public contracts. The Department of Transportation's bid specifications provide that individual pay items contained in a lump sum bid must fairly reflect the anticipated cost, overhead and profit attributable to the work to be performed. The specifications bar a bidder from obtaining additional compensation based upon inaccuracies reflected in the individual pay items. These provisions are designed to prevent bidders from submitting unbalanced bids, i.e., bids in which one or more of the pay items fails to carry its share of the cost of the work and the contractor's profit. At issue is the manner in which these specifications are to be applied to a deductive change in a construction contract where a government agency properly deletes a portion of the work because of unanticipated changes in federal regulations. We hold that in such a case the contract price may be adjusted by deducting the amounts of pay items corresponding to the work the contractor is saved or excused from performing.

I.
The facts are not in dispute. In October 1992, the Department solicited bids for a contract to rehabilitate several highways in northern New Jersey. The project included restoring twelve bridge structures along the various routes. We will describe in detail the Department's bid specifications later in this opinion. Suffice it to note here that the specifications required bidders to estimate the cost, overhead and anticipated profit of each line item. Prospective contractors were warned that they could not seek additional compensation in the event their estimates of pay items were inaccurate. However, the contract was to be awarded to the contractor with the lowest overall bid.
Several days before submitting its bid, Paquet received an estimate from a potential subcontractor for painting the effected bridges. Paquet prepared the forty-four items pertaining to painting the bridges utilizing that estimate. However, shortly before submitting its bid, Paquet received a much lower estimate from another subcontractor, O.J. Painting. Because it was "impractical" to revise the forty-four pay items corresponding to the bridge work, Paquet made no changes in its allocation of costs, overhead and anticipated profit with respect to those work units. It instead lowered the price of other pay items, thus reducing the overall bid. The end result was the submission of an unbalanced bid in which the pay items relating to the painting work included inflated amounts for cost, overhead and anticipated profit.
Paquet was the lowest of seven bidders at $17,906,324. The Department was not aware that the pay items contained in Paquet's bid were unbalanced. However, after Paquet was awarded the contract and before the painting work was to be commenced, it submitted the O.J. Painting subcontract to the Department for its approval. The forty-four pay items relating to bridge painting in Paquet's bid totaled $826,473.50. The O.J. Painting subcontract totaled $450,414. The Department approved the subcontract. *124 However, the record does not disclose whether the Department matched or compared the subcontract price with the pay items associated with bridge painting. Although Paquet asserts that the Department knew that the pay items relating to bridge painting were inflated when the O.J. Painting subcontract was approved, the transcript is silent on that question.
Approximately eleven months after Paquet was awarded the contract, the Occupational Safety and Health Administration (OSHA) revised its rules regarding the removal of lead-based paint. Compliance with the revised regulations would have required the expenditure of substantial costs that had not been anticipated by Paquet when it submitted its bid. Paquet submitted a claim for $608,000 to cover the additional anticipated costs of removing the lead-based paint. The Department rejected that claim after comparing Paquet's estimate with recently submitted bids for similar work that conformed with the new OSHA requirements. The bid specifications provided that where completion of a contract required unforeseen "extra work" and the parties could not agree upon an adjusted contract price, the Department could elect to solicit new bids. Pursuant to that provision, the Department opted to delete the bridge painting work from its contract with Paquet. The Department thus issued a change order eliminating the bridge painting work and reducing the contract price by deducting the forty-four pay items relating to removing the lead-based paint and repainting the bridges.
Paquet brought suit for breach of contract and unjust enrichment. At the conclusion of the bench trial, the judge found that the Department properly exercised its right to delete the bridge painting work from the contract because the parties could not agree on a price adjustment for the extra work that would have been required in order to comply with the revised federal regulations. The judge nevertheless awarded Paquet $325,000, finding that in adjusting the contract price it was improper for the Department merely to deduct the total of the pay items attributable to the bridge painting work. In reaching that conclusion, the judge acknowledged that Paquet had violated the bid specifications by submitting an unbalanced bid. The judge determined that Paquet had inflated the cost and overhead components of the pay items dealing with the bridge painting work. The judge concluded, however, that elimination of the pay items did not accurately reflect the cost and overhead Paquet saved by not having to perform that portion of the contract. The judge instead deducted the cost of the O.J. Painting subcontract ($450,414) from the total of the pay items pertaining to bridge painting ($826,473.50) and reduced the difference by Paquet's anticipated profit ($51,000), thereby arriving at a figure of $325,000. While conceding that the award of $325,000 lacked "mathematical certainty," the judge asserted that the figure more accurately reflected the cost and overhead of items for which Paquet had not been adequately compensated.

II.
Although Paquet did not file a cross-appeal[1], we first address its argument that the Department breached the contract by unilaterally deleting bridge painting work. We reject this contention.
*125 The specifications, which were incorporated into the contract, contemplated that completion of the contract might require the performance of tasks not envisioned in the agreement. Specification 104.08 was intended to guard against that eventuality by providing:
The Department reserves the right to require Extra Work as needed for the satisfactory completion of the Project. Such work will be designated as Extra Work when it is determined by the Engineer that such work is not covered by any of the various items for which there is a bid price or by combinations of such items. In the event portions of such work are determined to be covered by some of the various items for which there is a bid price or combinations of such items, the remaining portion of such work will be designated as Extra Work. Extra Work also includes work specifically designated as Extra Work in the Contract Documents.
The Contractor shall do such Extra Work and furnish labor, material and equipment therefor upon receipt of a Change Order, Field Order, or Supplementary Agreement and in the absence of such he shall not perform, nor be entitled to payment for, such Extra Work.
Payment for Extra Work required pursuant to the provisions in this Subsection, will be made as provided in Subsection 109.03, or as agreed to in a Supplementary Agreement.
If the Contractor and the Engineer cannot agree on a Supplementary Agreement for Extra Work and the Engineer, in his sole discretion, deems it inadvisable to have such work completed on a Force Account basis as provided in Subsection 109.03, the Commissioner may elect to have such work completed by others, and the Contractor shall not interfere therewith nor have any claim for additional compensation as the result of such election.
The procedure set forth in Specification 104.08 was utilized in this case. Upon learning of the revised OSHA regulations, Paquet submitted three claims for additional compensation in quick succession. These claims ranged in amounts from $210,000 to $750,000. Ultimately, Paquet demanded an additional $608,000 for the extra work necessary to comply with the revised regulations. As we noted earlier, the Department rejected that demand after comparing it with recently submitted bids that complied with the new rules on lead-based paint removal. The parties engaged in extensive negotiations, but were unable to reach an agreement. Consequently, the Department elected to delete the bridge painting work.
In its attempt to evade the applicability of Specification 104.08, Paquet characterizes the extra requirements imposed by the revised regulations as "chang[ing] the character of the work," thus implicating Specification 104.07. That provision sets forth procedures to be applied if an ordered "change in the [w]ork materially [alters] the character of the work of a[p]ay [i]tem ... and if the change substantially increases or decreases the actual unit cost of such changed item." In that event, the parties may agree on the compensation payable because of the change, or, if negotiations fail, proceed with the work on a "[f]orce [a]ccount basis," as provided by Specification 109.03.
The trial judge found that Specification 104.07 was not applicable. We agree. The revised OSHA regulations did not change the essential character of the work to be performed. They instead mandated that extra tasks be performed to assure the safety and health of the workers. Specification 104.08 was thus applicable, not Specification 104.07.
The simple and overriding fact is that the supervening revision of the OSHA regulations made the bridge painting work impractical, thereby discharging the parties from their respective contractual obligations. Cf. Directions, Inc. v. New *126 Prince Concrete Const. Co., 200 N.J.Super. 639, 644, 491 A.2d 1347 (App.Div.1985); Restatement (Second) of Contracts § 264 (1979). Having failed amicably to resolve its differences with Paquet, the Department properly removed the bridge painting work so that it could be rebid at an appropriate time. The Department did not breach the contract.

III.
The question then is how to fairly adjust the contract price in cases in which the parties are excused from performing portions of the work under Specification 104.08. The Department argues that the fairest approach is to reduce the contract price by deducting the pay items relating to the work that no longer need be performed. Paquet asserts that individual pay items should not be considered sacrosanct, and that there must be a searching inquiry into the cost, overhead and anticipated profit that would have been expended or realized had the contract been fully performed in accordance with its original terms.
Deeply implicated in our analysis is the concept of "unbalanced bids." This concept has been variously defined in our decisions, see, e.g., Sevell v. New Jersey Highway Authority, 329 N.J.Super. 580, 585, 748 A.2d 649 (App.Div.2000); Boenning v. Brick Tp. Municipal Utilities Auth., 150 N.J.Super. 32, 36, 374 A.2d 1214 (App.Div.1977); Armaniaco v. Cresskill, 62 N.J.Super. 476, 482, 163 A.2d 379 (App. Div.1960); Frank Stamato & Co. v. New Brunswick, 20 N.J.Super. 340, 344, 90 A.2d 34 (App.Div.1952); Corbiscello Brothers, Inc. v. Fort Lee, 93 N.J.Super. 374, 377, 225 A.2d 755 (Law Div.1967); Phifer v. Bayonne, 105 N.J.L. 524, 526, 146 A. 463 (Sup.Ct.1929), and those of other jurisdictions, see, e.g., Department of Labor and Industry v. Boston Water and Sewer Comm'n, 18 Mass.App.Ct., 621, 622, 469 N.E.2d 64, 66 (1984); Nelson v. New York City Mayor, 131 N.Y. 4, 11, 29 N.E. 814, 815 (Ct.App.1892); New York Mayor v. Brady, 115 N.Y. 599, 604, 22 N.E. 237, 238 (Ct.App.1889); Reilly v. New York City Mayor, 111 N.Y. 473, 477,18 N.E. 623, 624 (Ct.App.1888); In re Anderson, 109 N.Y. 554, 559, 17 N.E. 209, 210 (Ct.App.1888). In Armaniaco v. Cresskill, 62 N.J.Super. 476, 163 A.2d 379, we said that "[a]n unbalanced [unit price] bid is one where one or more of the items bid does not carry its share of the cost of the work and the contractor's profit." Id. at 482, 163 A.2d 379. A variation of that theme appeared in Frank Stamato & Co. v. City of New Brunswick, 20 N.J.Super. 340, 90 A.2d 34, where we observed that "[a]n unbalanced bid comprehends [one] based on nominal prices for some work and enhanced prices for other work." Id. at 344, 90 A.2d 34. As used here, the phrase connotes a bid containing pay items that do not fairly reflect the cost, overhead and anticipated profit attributable to a work unit.
However phrased, the practice of submitting unbalanced bids has been recognized as one that is "admittedly susceptible of fraud and collusion and carr[ies] the additional danger of placing an irresponsible bidder in a position of bidding higher on the earlier work to be done under the contract and lower on the latter work." Armaniaco v. Cresskill, 62 N.J.Super. at 482, 163 A.2d 379. "Such a bidder could, after having taken his profit out of his early payments on a job, fail to complete the work called for." Ibid. Moreover, the submission of unbalanced bids may result in a "mockery of fair competition between bidders." Id. at 488, 163 A.2d 379 (Conford, J., concurring). The requirement of unit bidding is important even where the contract is to be awarded to the bidder who submits the lowest overall bid. Id. at 489, 163 A.2d 379. The public entity "is always concerned with the financial capacity of the contractor to perform." Ibid. It cannot realistically assess the ability of the contractor to meet his obligations when individual pay items are inflated or deflated or are otherwise lacking in integrity. Ibid.
*127 We do not suggest that the practice has been universally condemned. "The justification of the unbalanced bid lies in the fact that the expenses of mobilizing the construction plant, bringing equipment and materials to the site, and the general costs of getting the work started are appreciable." Id. at 482, 163 A.2d 379. These items sometimes "do not appear in the bid and, therefore, are liquidated only as the work on the bid items progresses." Ibid. Moreover, some courts have characterized as "perfectly proper" the practice by which a contractor "bid[s] low on an item that [he] thinks will underrun the quantities listed in the proposal form" and "make[s] a high bid on something that is likely to overrun the stated quantity." Boenning v. Brick Tp. Municipal Utilities Auth., 150 N.J.Super. at 37, 374 A.2d 1214. We need not offer our view as to whether such a "gamble" constitutes an appropriate means of doing business with the government. We merely note that unbalanced bids are generally allowed absent a specific prohibition in the public entity's bid specifications or proposal.
Against this backdrop, Specification 102.08 mandates that pay items contained in a bid reflect the actual cost, overhead and anticipated profit of the unit of work to be performed. Moreover, the bidder is barred from seeking additional compensation in instances in which the cost, overhead or anticipated profit is inaccurately reflected in the pay item. The operative language reads as follows:
102.08 Balanced Bids. The bidder shall prepare his bid so that it reflects under each Pay Item the actual cost which the bidder anticipates the performance of that particular item entails, together with a proportional share of the bidder's anticipated profit, overhead and costs to perform work for which no Pay Item is provided. The Department will not consider any claim for additional compensation arising from the bid on an item, or group of items, inaccurately reflecting the cost of such work or containing a disproportionate share of the bidder's anticipated profit, overhead and other costs. The Contractor expressly waives the right to pursue such claims either before the Commissioner or under the terms of the New Jersey Contractual Liability Act.
Specification 101.03 defines "pay item" in terms of "a specifically described item of work for which the bidder provides a per unit or lump sum price" in its bid. Plainly, these specifications mandate that the bid unit price consist of the actual cost along with a proportional share of overhead and anticipated profit attributable to the portion of work to be performed. Additionally, they warn the bidder that he can make no claim based on the fact that he has disproportionately allocated cost, overhead and profit among the various pay items.
These provisions were clearly designed to bar bidders from submitting unbalanced bids. The contract in this case was carried out by the parties under the essential premise that the pay items specified in the bid were accurate. Moreover, the pay items specified in the bid were used by the parties in determining the amount of progress payments as they came due. During the course of the construction, the work completed each month was multiplied by the bid and the price for the pay item of work to arrive at the monthly compensation. The Department calculated the compensation due by taking the actual quantity of work and multiplying it by the unit bid price for that pay item of work. This method of payment was in accordance with Specification 102.04, which states that "payment will be made at the original unit prices for the quantities of work accepted."
We recognize that the federal courts have taken a somewhat different approach. Federal contracts generally contain a clause providing for "equitable adjustments" in instances where the governmental agency modifies the contract so as to increase or decrease the costs of work to be performed. The phrase "equitable adjustment" is a legal term of art. It signifies *128 a principle designed "to keep a contractor whole when the government modifies a contract." Bruce Construction Corp. v. United States, 163 Ct.Cl. 97, 324 F.2d 516, 518 (1963). The equitable adjustment rule incorporates the principle that the proper measure in recalculating the contract price is "the difference between what it would have cost to perform the work as originally required and what it cost to perform the work as changed." General Railway Signal v. Washington Metropolitan Area Transit Auth., 875 F.2d 320, 325 (D.C.Cir.1989) (quoting Modern Foods, Inc., ASBCA 2090, 57-1 B.C.A. (CCH) ¶ 1229 (1975)). In applying this measure, the federal courts do not view as "sacrosanct" the monetary amounts allocated to cost, overhead and anticipated profit in the line items contained in the contractor's bid. Ibid.; see also Pacific Architects and Engineers v. United States, 203 Ct.Cl. 499, 491 F.2d 734, 740 (1974); Nager Electric Company v. United States, 194 Ct.Cl. 835, 442 F.2d 936, 946 (1971); Bruce Construction Corp. v. United States, 324 F.2d at 518.
These cases are clearly distinguishable. Although the federal courts have consistently rejected efforts to equate bid prices for various portions of work with contract prices, "[t]he reason is [a] judicial recognition that contractors frequently submit unbalanced bids, understating the true costs of one portion of the contract with an offsetting overstatement on a different portion." General Railway Signal v. Washington Metropolitan Area Transit Authority, 875 F.2d at 325. For the same reason, because the practice of submitting unbalanced bids is not discouraged, "progress payment" under federal contracts need not bear any "relationship to the unit price schedule of which the line items [are] a part." Ibid. The "casual" and "offhand" manner in which line items are specified in federal contracts precludes reliance on pay items in determining the equitable adjustment of costs, overhead and profit. Ibid.
We do not disagree with the principle of equitable adjustment. Corrective measures should be utilized "to keep a contractor whole when [a public entity] modifies a contract." Bruce Construction Corp. v. United States, 324 F.2d at 518. Even though not expressly set forth in the contract, we think that this principle would ordinarily fall within the purview of the parties' implied covenant of good faith and fair dealing. See Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420-21, 690 A.2d 575 (1997); W.V. Pangborne & Co. v. New Jersey Dep't of Transportation, 116 N.J. 543, 560, 562 A.2d 222 (1989); Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182, 425 A.2d 1057 (1981). Where the contract is silent, the proper measure of the adjustment should generally be "the difference between what it would have cost to perform the work as originally required and what it cost to perform the work as changed." General Railway Signal v. Washington Metropolitan Area Transit Auth., 875 F.2d at 325.
This much conceded, the contract itself may provide a formula or other mechanism to be utilized in determining the appropriate adjustment in the contract price. Where, as here, the contract expressly prohibits unbalanced bids and mandates that pay items accurately reflect the cost, overhead and anticipated profit attributable to the particular portion of work to be performed, and further directs that "payment will be made at the original unit price for the quantities of work accepted," we perceive no injustice in effectuating these provisions as written.
The parties here struck a bargain that specified a particular price for each work unit to be performed. Both parties agreed to be bound in that respect. As repeatedly emphasized by the Department, it would have been bound by the amounts specified in the pay items in the event that the cost, overhead and anticipated profit were understated *129 rather than inflated.[2] The parties had the freedom to allocate risks posed by future modifications of, and changes in, the work to be performed. Their agreement defined their rightful expectations in that respect.
The result we reach is in accord with federal cases. The federal courts have consistently held that a clause limiting overhead payments in the event of change orders trumps the standard provision requiring equitable adjustments. See Reliance Ins. Co. v. United States, 931 F.2d 863, 865 (Fed.Cir.1991); Santa Fe Engineers v. United States, 801 F.2d 379, 381 (Fed.Cir.1986). In the cases cited, the clause in question set a ceiling on the amount of overhead costs recoverable in the event of modifications of the work to be performed. In rejecting the contractors' claims for overhead beyond the percentage limits set by the ceiling, one court held that the clause limiting recovery was "operat[ive] regardless of the size and scope of contract changes," and that it qualified the provision requiring equitable adjustments. Reliance Ins. Co. v. United States, 931 F.2d at 865.
Our conclusion also comports with sound public policy. The purpose of public bidding is to "secure for the public the benefits of unfettered competition[,]" and to "guard against favoritism, improvidence, extravagance and corruption." Terminal Construction Corp. v. Atlantic County Sewerage Auth., 67 N.J. 403, 410, 341 A.2d 327 (1975). The objective is to "protect the public by placing bidders on an equal footing...." National Waste Recycling, Inc. v. MCIA, 150 N.J. 209, 219, 695 A.2d 1381 (1997). Public bidding rules "exist for the primary benefit of the taxpayer, not the bidder, and must be construed with `sole reference' to the public good." N.E.R.I. Corp. v. New Jersey Highway Auth., 147 N.J. 223, 236, 686 A.2d 328 (1996). While government must turn square corners in its dealings with contractors, its mission "is to obtain the best economic result for the public entity and ultimately for the taxpayers." Wasserman's, Inc. v. Middletown, 137 N.J. 238, 246, 645 A.2d 100 (1994).
Within this context, we have already pointed out that the practice of submitting unbalanced bids has received uneven treatment in our decisions. Compare Boenning v. Brick Tp. Municipal Utilities Auth., 150 N.J.Super. at 37-38, 374 A.2d 1214, with Armaniaco v. Cresskill, 62 N.J.Super. at 488-91, 163 A.2d 379. Whatever else may be said about the practice, it is abundantly plain that a governmental agency may seek to prohibit it in its specifications. We are obliged to give full force and effect to such a provision.
It is undisputed that Paquet in its bid inflated the cost, overhead and anticipated profit attributable to the bridge work contemplated by the proposal. It is also undisputed that Paquet deliberately understated the cost, overhead and anticipated profit associated with other work items in order to arrive at its overall lump sum bid. We do not suggest that Paquet harbored an evil or corrupt motive. Nevertheless, the critical fact remains that Paquet flouted the clearly expressed requirements of Specification 102.08, and that it acted at its peril embarking upon this course. We merely enforce the contract as written.
Reversed.
NOTES
[1] Cross-appeals may be taken from final judgments, orders and administrative decisions. R. 2:4-2. While we have said that "an appeal lies only from a written order or judgment, not from opinions or oral decisions which have not been reduced to order or judgment," Valenti v. Planning Bd. City of Absecon, 244 N.J.Super. 77, 82, 581 A.2d 878 (App.Div. 1990), the judge's ruling that the Department had not breached the contract was incorporated by reference into the final judgment. It would thus have been preferable had Paquet filed a cross-appeal on this issue. However, the parties have thoroughly and conscientiously briefed and argued this point. We, therefore, choose to resolve the issue on the merits.
[2] The Department has the right to reject a bid because it is unbalanced. Nevertheless, the Department represents that once a bid is accepted, it, like the contractor is bound by the amounts specified in the individual pay items.