794 A.2d 141

M.J. PAQUET, INC., PLAINTIFF–APPELLANT, v. NEW
JERSEY DEPARTMENT OF TRANSPORTATION,
DEFENDANT–RESPONDENT.

Argued October 9, 2001—Decided April 4, 2002.

*Paul Z. Lewis* argued the cause for appellant (*Lewis & McKenna*, attorneys; *Mr. Lewis, Vittorio S. LaPira* and *Michael C. Delaney*, on the briefs).

*Thomas H. Shar*, Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Nancy Kaplen*, Assistant Attorney General, of counsel).

*John F. Neary* submitted a brief on behalf of *amicus curiae*, Construction Industry Advancement Program of New Jersey (*Connell Foley*, attorneys).

The opinion of the Court was delivered by

ZAZZALI, J.

This appeal requires the Court to determine whether an equitable adjustment should be awarded to a successful bidder of a public contract whose performance is rendered impracticable during the course of the contract. M.J. Paquet, Inc. (Paquet) submitted an unbalanced bid for a contract with the New Jersey Department of Transportation (DOT) to rehabilitate several highways and bridges in New Jersey. The DOT awarded Paquet the contract. Nearly one year later, the Occupational Safety and Health Administration (OSHA) issued revised regulations substantially affecting Paquet's performance of the bridge painting work. After the parties could not agree on an increased amount for the bridge painting work, the DOT deleted that work from the con-

tract. Thereafter, Paquet commenced this action seeking legal and equitable relief.

The trial court found that the DOT properly had deleted the bridge-painting work from the contract, but nonetheless awarded Paquet an equitable adjustment for the other tasks that the contractor had completed. The Appellate Division upheld the DOT's right to delete the bridge-painting work, but denied Paquet any equitable adjustment. *M.J. Paquet v. New Jersey Dep't of Transp.*, 335 *N.J.Super.* 130, 144, 761 *A.*2d 122 (App.Div.2000). The panel reasoned that such an adjustment was not warranted because DOT specifications prohibited unbalanced bids and purportedly barred recovery in this setting. *Ibid.*

We affirm the Appellate Division's ruling that the DOT properly deleted the bridge painting portion of the contract. However, we reverse the decision denying Paquet an equitable adjustment of the contract price, and remand the matter to the trial court for a determination of the amount of that adjustment.

I

In October 1992, the DOT solicited bids for a contract to rehabilitate highways in northern New Jersey. The project included highway resurfacing, safety improvements, and the restoration and painting of twelve bridges along various routes. Several days before submitting its bid, Paquet received an estimate from a potential subcontractor for the bridge painting work included in the project. Paquet used that estimate to calculate the forty-four individual pay items contained in its bid pertaining to the bridge painting. After adding its customary thirty percent mark-up for costs, overhead, and profit to the bridge painting pay items, Paquet's total bid for the bridge painting work amounted to $826,473.50. Shortly before the bid submission deadline, Paquet received a significantly lower estimate of $450,414 for the bridge painting work from subcontractor O.J. Painting.

■ According to Paquet, because "it was impracticable and highly risky to redo all the prices for the [forty-four] bridge structure items," Paquet did not amend the $826,473.50 figure it originally entered on the bid for the bridge painting work. Rather, Paquet lowered the price of several of the other "common" items, including mobilization and construction layout costs, to offset the now inflated price for the bridge painting work. Accordingly, Paquet submitted an "unbalanced" bid to the DOT. An "unbalanced" bid is one "in which one or more of the pay items fails to carry its share of the cost of the work and the contractor's profit." *Paquet, supra,* 335 *N.J.Super.* at 132, 761 *A.*2d 122.

Paquet's bid of $17,906,324 was the lowest presented to the DOT, which subsequently awarded Paquet the contract. At that time, the DOT was unaware that Paquet had submitted an unbalanced bid. Before the work commenced, Paquet submitted and received approval of the O.J. Painting subcontract from the DOT. The record does not indicate whether the DOT compared the subcontract price with the amount in Paquet's bid for the bridge painting work.

After the DOT awarded Paquet the contract, OSHA issued revised regulations in respect of the cleaning and painting of existing bridges containing lead-based paint. Those regulations directly affected the bridge painting work in the Paquet DOT contract. Paquet asserted that the new OSHA regulations "significantly increased the nature and the magnitude of procedures governing [the] cleaning and painting [of] existing structural steel" containing lead-based paint. Accordingly, Paquet informed the DOT that compliance with the new regulations would result in Paquet's incurring substantial and unanticipated costs. Paquet made several requests to the DOT to increase the original contract price, culminating in a final request of $1,280,267.50 to cover costs precipitated by the new regulations.

After considering Paquet's proposal, the DOT informed Paquet that the DOT had decided to excise the bridge painting from the contract. Paquet insisted that the DOT did not have the right to

remove the bridge painting work, and that any such removal would be a modification of the contract that would entitle Paquet to compensation. Subsequently, Paquet received a change order from the DOT indicating that the bridge painting work had been deleted because "[n]egotiations with [Paquet] . . . [were] not successful." The amount deleted, $826,473.50, represented the amount Paquet provided in its bid for the forty-four bridge painting pay items.

Paquet responded by filing a Contractual Notice Form objecting to the DOT's removal of the bridge painting work. Specifically, Paquet alleged that an item of work could be eliminated from the contract only if the item was unnecessary. According to Paquet, the painting work was necessary to rehabilitate the bridges. Further, if Paquet did not complete the work the DOT eventually would be required to commission another contractor to do the work. Finally, Paquet insisted that "even if the [DOT were] entitled to eliminate the majority of the painting work, under the contract, equity[,] and case law, the [DOT] would only be entitled to a deduction for the actual cost of the work, not a deduction based on the original contract unit prices."

The parties unsuccessfully attempted to settle the dispute pursuant to the alternative dispute resolution procedure set forth in the contract. Paquet then filed this action against the DOT. Paquet claimed that the DOT was not authorized to delete the painting work from the contract and, alternatively, that the DOT could not delete the entire amount of $826,473.50 listed in the contract for the bridge painting work. The trial court found that the DOT properly deleted the bridge painting work, holding that because the new OSHA regulations had "significant[ly] alter[ed]" the circumstances surrounding the parties' contract, the contract was impossible to perform. The court also held that the entire $826,473.50 should not have been deleted because Paquet was entitled to an equitable adjustment. The trial court reasoned that Paquet had deleted approximately $376,000 from the non-bridge painting portion of the contract to reflect the difference between

the total of the pay items pertaining to bridge painting ($826,-473.50) and the actual cost of the O.J. Painting subcontract ($450,414). Further, the court found that when the DOT deleted the $826,473.50 from the contract the DOT understood that the actual estimate used by Paquet for the bridge painting work was $450,414, the amount specified in the O.J. Painting subcontract approved by the DOT. However, the trial court did not award Paquet the full $376,000, observing that the DOT "[was] entitled to have a reduction of [the $376,000 amount] by virtue of the profit ... that was anticipated in that aspect of the job." Conceding that it could not determine the reduced amount with "any mathematical certainty," the trial court awarded Paquet $325,000.

The Appellate Division affirmed the trial court's decision that the DOT properly deleted the bridge painting work from the contract, but reversed the equitable adjustment award. The Appellate Division noted that DOT specifications incorporated into the contract explicitly state that individual pay items must reflect fairly the estimated cost, overhead, and profit attributable to the work to be performed. The specifications also bar a contractor from receiving additional compensation based on inaccuracies reflected in individual pay items. According to the court, those provisions were developed to discourage contractors from submitting unbalanced bids. Specifically, the panel stated:

> It is undisputed that Paquet in its bid inflated the cost, overhead and anticipated profit attributable to the bridge work contemplated by the proposal. It is also undisputed that Paquet deliberately understated the cost, overhead and anticipated profit associated with other work items in order to arrive at its overall lump sum bid.
>
> [*Paquet, supra,* 335 *N.J.Super.* at 144, 761 *A.*2d 122.]

Thus, the court concluded that under the express terms of the contract Paquet was not entitled to any portion of the $826,473.50 deleted from the contract.

We granted Paquet's petition for certification. 167 *N.J.* 635, 772 *A.*2d 937 (2001).

## II

We consider first whether the DOT breached the parties' contract by deleting the bridge painting work. Our analysis includes an examination of public contract principles aptly characterized by the Appellate Division as "arcane." *Paquet, supra,* 335 *N.J.Super.* at 132, 761 *A.*2d 122.

### A

Pursuant to *N.J.S.A.* 27:7–25, "[a]ll work of construction . . . and of extensive repairs to improved roads taken over as state highways shall be by contract. . . ." According to *N.J.S.A.* 27:7–1, the term "work" includes the "[b]uilding, repair and operation of bridges." Further, *N.J.S.A.* 27:7–11 provides, in pertinent part: "All work of improvement, betterment, reconstruction or resurfacing [of state highways] shall be done in accordance with plans and specifications prepared by the [DOT]."

■ The commissioner of the DOT "shall advertise for bids on the work and materials covered by the plans and specifications for each project[,]" *N.J.S.A.* 27:7–29, and must "award the contract to the lowest responsible bidder." *N.J.S.A.* 27:7–30. This "practice of public bidding is universally recognized and deeply embedded in the public policy of this State." *N.E.R.I. Corp. v. New Jersey Highway Auth.,* 147 *N.J.* 223, 236, 686 *A.*2d 328 (1996). The purpose of public bidding is to " 'secure for the public the benefits of unfettered competition[,]' and to 'guard against favoritism, improvidence, extravagance, and corruption.' " *National Waste Recycling v. Middlesex County Improvement Auth.,* 150 *N.J.* 209, 219, 695 *A.*2d 1381 (1997) (quoting *Terminal Constr. Corp. v. Atlantic County Sewerage Auth.,* 67 *N.J.* 403, 410, 341 *A.*2d 327 (1975)).

The contract at issue in the present appeal incorporates the DOT's 1989 "Standard Specifications For Road and Bridge Construction." Included among those specifications are provisions addressing circumstances in which the work to be performed must

be modified or supplemented. Paquet contends that because the OSHA regulations materially changed the character of the bridge painting work, Specification 104.07, "Changes in Character of Work," applies to the present situation.

Specification 104.07 provides that if the DOT concludes that "an ordered change in the Work materially changes the character of the work of a Pay Item[1] ... and [that] ... the change substantially increases or decreases the actual unit cost of such changed item," the parties may negotiate a modification of the contract price for the pay item that has been materially changed. If the parties cannot reach an agreement, they may continue with the work on a "force account" basis pursuant to which the contractor is paid for its labor, bonds, insurance, taxes, materials, equipment, plan, profit, and overhead in a specifically delineated manner as set forth in Specification 109.03. In either case, the "changed" work is completed by the contractor.

The DOT contends that the OSHA regulations created extra work, thereby triggering Specification 104.08, "Extra Work." Specification 101.03 defines "Extra Work" as "new and unforeseen work found essential to the satisfactory completion of the Project, as determined by the Engineer, and not covered by any of the various Pay Items for which there is a bid price or by combination of such items." Specification 104.08 provides, in pertinent part, that

> [t]he Department reserves the right to require Extra Work as needed for the satisfactory completion of the Project. *Such work will be designated as Extra Work when it is determined by the Engineer that such work is not covered by any of the various items for which there is a bid price* or by combinations of such items. . . .
>
> *The Contractor shall do such Extra Work ... upon receipt of a Change Order, Field Order, or Supplementary Agreement and in the absence of such he shall not perform, nor be entitled to payment for, such Extra Work.*

---

[1] According to Specification 101.03, a Pay Item is a "specifically described item of Work for which the bidder provides a per unit or lump sum price in the Proposal."

Payment for Extra Work required pursuant to the provisions in this Subsection, will be made as provided in Subsection 109.03 [on a[f]orce [a]ccount basis], or as agreed to in a Supplementary Agreement.

*If the Contractor and the Engineer cannot agree on a Supplementary Agreement for Extra Work and the Engineer, in his sole discretion, deems it inadvisable to have such work completed on a Force Account basis . . ., the Commissioner may elect to have such work completed by others, and the Contractor shall not interfere therewith nor have any claim for additional compensation as the result of such election.*

[ (Emphasis added).]

■ The Appellate Division upheld the trial court's determination that Specification 104.08 was applicable. We agree. The requirements imposed by the revised OSHA regulations for the bridge painting work did not "materially change[ ] the character" of the bridge painting work. The essence of the bridge painting work—cleaning and painting the affected bridges—remained the same. Rather than changing the character of the work, the revised OSHA regulations created "new and unforeseen work" that was "essential" to the satisfactory completion of the project. Moreover, this "new and unforseen work" was "not covered by any of the various Pay Items for which there is a bid price," and therefore constitutes "Extra Work" as defined in Specification 101.03.

The requirements imposed by the revised OSHA regulations were "new" because those requirements had not been imposed previously for the bridge painting work. The revised OSHA regulations "mandated that *extra* tasks be performed to assure the safety and health of the workers." *Paquet, supra,* 335 *N.J.Super.* at 137, 761 *A.*2d 122 (emphasis added). Likewise, the requirements were "unforeseen" because the parties could not have anticipated their promulgation. Similarly, the work dictated by the new regulations was not covered by any of the various pay items for the bridge painting work. Finally, the new regulations were compulsory and, therefore, were "essential" to the satisfactory completion of the project.

Because the requirements imposed by the revised OSHA regulations for the bridge painting work were more properly charac-

terized as "Extra Work" as set forth in Specifications 101.03 and 104.08 respectively, several options were available to the DOT. The DOT could have negotiated a Supplementary Agreement with Paquet to perform the extra work at a negotiated price; it could have issued a Change or Field Order obliging Paquet to perform the work on a force account basis; or it could have elected not to have Paquet perform the extra work. It chose the last option. That decision was within its discretion pursuant to Specification 104.08.

### B

Because the extra work required by the revised regulations was inextricably intertwined with the original bridge painting, one contractor necessarily had to perform both the extra work required by the revised regulations and the original painting work. When the DOT decided that Paquet would not perform the extra work, the DOT concomitantly determined that Paquet would not perform any of the original bridge painting work. Accordingly, we must address whether the DOT had a proper legal basis for deleting the original pay items of bridge painting work from the contract.

Pursuant to Specification 104.02, "[t]he [DOT] reserves the right ... to omit any Pay Item or portion of the Work[.]" Specification 104.06, however, circumscribes Specification 104.02, and authorizes the DOT to eliminate pay items from the contract only if the pay items are "found unnecessary for the proper completion of the Work." Specification 104.06. There is no suggestion that the bridge painting work was unnecessary for the proper completion of the project. Accordingly, the DOT must have had an alternative basis to legitimize the deletion of the original pay items of bridge painting work.

The Appellate Division ultimately based its determination that the DOT properly deleted the bridge painting work on the principle of impracticality. As stated by the court, "[t]he simple and overriding fact is that the supervening revision of the OSHA

regulations made the bridge painting work impractical, thereby discharging the parties from their respective contractual obligations." *Paquet, supra,* 335 *N.J.Super.* at 137, 761 *A.*2d 122 (citations omitted). We agree.

In reaching its decision, the Appellate Division cited *Directions, Inc. v. New Prince Concrete Construction Co.,* 200 *N.J.Super.* 639, 491 *A.*2d 1347 (App.Div.1985), in which the grant of summary judgment in favor of the plaintiff subcontractor was reversed because a DOT directive rendered the defendant contractor's performance under the contract impracticable. *Id.* at 644, 491 *A.*2d 1347. The *New Prince* panel relied on Sections 261 and 264 of the *Restatement (Second) of Contracts* (1979), which discuss the principle of impracticability. *New Prince, supra,* 200 *N.J.Super.* at 644, 491 *A.*2d 1347. Section 261, "Discharge by Supervening Impracticability," states:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Section 264, "Prevention by Governmental Regulation or Order," provides that

> [i]f the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made.

According to section 264, if a governmental regulation renders a party's performance under a contract impracticable, it is unnecessary to prove under section 261 that the parties had a "basic assumption" that the event which made the party's performance impracticable would not occur. The promulgation of the revised OSHA regulations rendered the parties' respective performances under the contract impracticable because the parties could not agree on a price for the bridge painting work as modified. Thus, pursuant to section 264, the DOT is not required to prove that the parties had a basic assumption when they entered into the contract that the cost of the bridge painting work would not

increase substantially due to revised governmental agency regulations.

■ Here, the DOT correctly deleted the bridge painting work from the contract pursuant to the principle of impracticability. The essence of the principle is that a party's performance under a contract is rendered impracticable by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made. *Restatement (Second) of Contracts, supra,* § 261. In this case, OSHA's revised regulations governing lead paint removal and the painting of existing structural steel surfaces triggered the impracticability. Paquet would have had to expend substantial, unanticipated costs to complete its performance of the bridge painting work. Paquet claimed it could not perform the additional work, work that was inextricably intertwined with the original painting work, unless it received adequate compensation. The DOT did not consent to pay the excessive amount of compensation that it claimed Paquet sought for the additional painting work. Thus, both parties' respective performances under the contract became impracticable. We therefore hold that the DOT properly deleted the bridge painting work from the contract pursuant to the principle of impracticability.

### III

We now consider whether Paquet is entitled to an equitable adjustment of the contract price.

### A

The 1989 DOT Specifications incorporated in the parties' contract do not provide for an "equitable adjustment." A review of New Jersey case law reveals that our courts have not adopted the concept as a form of equitable relief available to parties to public contracts. In the absence of relevant New Jersey law, an analysis of federal case law concerning equitable adjustment principles provides guidance.

██ Typically, public contracts involving the federal government contain equitable adjustment clauses safeguarding the contractor in circumstances where the government modifies the contract, thereby increasing or decreasing the cost to the contractor for the work to be performed. *Paquet, supra,* 335 *N.J.Super.* at 140, 761 *A.*2d 122 (citing *Bruce Constr. Corp. v. United States,* 163 *Ct.Cl.* 97, 324 *F.*2d 516, 518 (1963), *superseded by rule on o.g. as stated in Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.,* 175 *F.*3d 1221, 1224 n. 30 (10th Cir.1999)). The term "equitable adjustment" is a legal term of art. *General Ry. Signal Co. v. Washington Metro. Area Transit Auth.,* 875 *F.*2d 320, 324 (1989), *cert. denied,* 494 *U.S.* 1056, 110 *S.Ct.* 1524, 108 *L.Ed.*2d 764 (1990). Its proper measure is " 'the difference between what it would have cost to perform the work as originally required and what it cost to perform the work as changed.' " *Id.* at 325 (quoting *Modern Foods, Inc.,* ASBCA 2090, 57–1 B.C.A. (CCH) ¶ 1129 (1975)). Stated simply, the purpose of an equitable adjustment is " 'to keep a contractor whole when the Government modifies a contract.' " *General Ry., supra,* 875 *F.*2d at 324–25 (quoting *Bruce Constr., supra,* 324 *F.*2d at 518); *accord VHC Inc. v. Peters,* 179 *F.*3d 1363, 1366 (Fed.Cir.1999); *UMC Elecs. v. United States,* 43 *Fed. Cl.* 776, 812 (1999), *aff'd,* 249 *F.*3d 1337 (Fed.Cir.2001); *Shank–Artukovich v. United States,* 13 *Cl.Ct.* 346, 361 (1987), *aff'd,* 848 *F.*2d 1245 (1988); *J.F. Shea Co. v. United States,* 10 *Cl.Ct.* 620, 627 (1986).

A significant majority of federal courts that have addressed the principle of equitable adjustment refer to a specific clause contained in the public contract at issue. See *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.,* 175 *F.*3d 1221, 1244 (10th Cir.1999); *Reliance Ins. Co. v. United States,* 931 *F.*2d 863, 866 (Fed.Cir.1991); *General Ry., supra,* 875 *F.*2d at 322; *Pacific Architects and Eng'rs Inc. v. United States,* 203 *Ct.Cl.* 499, 491 *F.*2d 734, 737 (1974). However, some courts have discussed and applied the principle generally, without reference to a clause in the given contract. See *Nager Elec. Co. v. United States,* 194 *Ct.Cl.* 835, 442 *F.*2d 936, 945 (1971) (citation omitted) ("The measure for an equitable adjustment to the contract price resulting from a

change order is ... framed in terms of 'reasonable cost.' "); *Bruce Constr., supra,* 324 *F.*2d at 518 ("Equitable adjustments ... are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract.").

As noted by the Appellate Division, some federal courts have held that a specific clause limiting overhead payments in the event of change orders supersedes a general provision providing for an equitable adjustment. *Paquet, supra,* 335 *N.J.Super.* at 143, 761 *A.*2d 122. In *Reliance, supra,* 931 *F.*2d at 864–65, and *Santa Fe Engineers v. United States,* 801 *F.*2d 379, 380 (Fed.Cir.1986), the United States Court of Appeals for the Federal Circuit construed the same "limiting clause," the "G–10" clause set forth in the standard construction contract utilized by the Veterans Administration (VA). In both cases, the court held that the G–10 clause limited the contract's "standard changes" clause by restricting how much overhead and profit a contractor may collect when a contract is modified. *Reliance, supra,* 931 *F.*2d at 865; *Santa Fe, supra,* 801 *F.*2d at 383. The "standard changes" clause functions in VA construction contracts as an equitable adjustment clause. *Reliance, supra,* 931 *F.*2d at 866. *See also Linda Newman Constr. Co. v. United States,* 48 *Fed.Cl.* 231, 233 (2000) (discussing same "G–10" clause at issue in *Reliance* and *Santa Fe,* although not specifically labeling it as such).

A number of states also provide for equitable adjustments in public contracts, including Florida, Louisiana, Maryland, New York, Ohio, Oregon and Texas. See *Hendry Corp. v. Metropolitan Dade County,* 648 *So.*2d 140, 141 n. 2 (1994), *review denied,* 659 *So.*2d 1087 (Fla.1995); *Ronald Adams Contractor v. City of New Orleans,* 764 *So.*2d 1149, 1152 (2000), *writ denied,* 768 *So.*2d 1287 (La.2000); *State Highway Admin. v. David Bramble, Inc.,* 351 *Md.* 226, 717 *A.*2d 943, 948 n. 7 (1998); *Tempforce Inc. v. Municipal Hous. Auth. of Schenectady,* 263 *A.D.*2d 926, 694 *N.Y.S.*2d 240, 242 n. 1 (1999), *appeal dismissed,* 94 *N.Y.*2d 838, 702 *N.Y.S.*2d 586, 724 *N.E.*2d 378 (1999); *Sherman R. Smoot Co. v. Ohio Dep't of Admin. Servs.,* 136 *Ohio App.*3d 166, 736 *N.E.*2d 69,

74–75 (2000); *State v. Triad Mechanical,* 144 *Or.App.* 106, 925 *P.*2d 918, 920 (1996), *review denied,* 324 *Or.* 488, 930 *P.*2d 852 (1996); *Texas Natural Resource Conservation Comm'n v. IT Davy,* 998 *S.W.*2d 898, 899 (Tex.App.1999), *abrogated on o.g., General Servs. Comm'n v. Little–Tex Insulation Co.,* 39 *S.W.*3d 591 (2001).

## B

Paquet contends that the DOT improperly adjusted the contract price by deducting the full amount for the pay items relating to the deleted bridge painting work. Because the amount set forth in the contract for the pay items of bridge painting included compensation for work performed on other parts of the contract, Paquet asserts that it should have received an equitable adjustment.

The Appellate Division found that the DOT correctly reduced the contract price by the full amount of the pay items relating to the bridge painting work in accordance with Specification 102.08, "Balanced Bids." Specification 102.08 states, in pertinent part:

**Balanced Bids.** The bidder shall prepare his bid so that it reflects under each Pay Item the actual cost which the bidder anticipates the performance of that particular item entails, together with a proportional share of the bidders anticipated profit, overhead and costs to perform work for which no Pay Item is provided. *The Department will not consider any claim for additional compensation arising from the bid on an item, or group of items, inaccurately reflecting the cost of such work or containing a disproportionate share of the bidder's anticipated profit, overhead and other costs.* The Contractor expressly waives the right to pursue such claims either before the Commissioner or under the terms of the New Jersey Contractual Liability Act.

[ (Emphasis added).]

Because Paquet submitted a bid that contained an inflated amount for the pay items relating to the bridge painting work and an understated amount for other pay items in the contract, Paquet's bid was unbalanced within the meaning of Specification 102.08. Thus, the court concluded that Paquet could not make a claim for additional compensation under the contract arising from its unbalanced bid.

Although the Appellate Division "d[id] not disagree with the principle of equitable adjustment," *Paquet, supra,* 335 *N.J.Super.* at 141, 761 *A.*2d 122, the court found the principle inapplicable to Paquet's contract. The court began its discussion by noting that "[e]ven though [the principle of equitable adjustment was] not expressly set forth in the contract, we think that this principle would ordinarily fall within the purview of the parties' implied covenant of good faith and fair dealing." *Id.* at 141–42, 761 *A.*2d 122. However, because the DOT specifications were incorporated into the contract and because Specification 102.08 expressly authorized the DOT to refuse Paquet's claim, the court stated that it "perceive[d] no injustice in effectuating [Specification 102.08] as written." *Id.* at 142, 761 *A.*2d 122. Finally, the Appellate Division noted that its decision was in accord with federal cases that have held that "limiting" clauses such as Specification 102.08 vitiate the standard provision requiring equitable adjustments. *Id.* at 143, 761 *A.*2d 122.

▆▆▆▆ Although we agree that the absence of an equitable adjustment clause in a public contract is not dispositive in respect of whether an equitable adjustment should be granted in a specific case, we disagree with the Appellate Division's holding that Specification 102.08 prohibits granting an equitable adjustment in this appeal for two reasons. First, we find that Specification 102.08 is ambiguous and therefore should be construed against the draftsman, the DOT. Second, even assuming that Specification 102.08 is not ambiguous and that it denies Paquet relief by its plain language, we nonetheless would find in favor of Paquet given the unique circumstances presented in this appeal.

As noted, the Appellate Division relied on the following sentence in Specification 102.08 as the lynchpin for its holding: "The [DOT] will not consider *any claim for additional compensation* arising from the bid on an item, or group of items, inaccurately reflecting the cost of such work or containing a disproportionate share of the bidder's anticipated profit, overhead and other costs." *Paquet, supra,* 335 *N.J.Super.* at 140, 761 *A.*2d 122 (quoting Specification 102.08) (emphasis added). It is undisputed that Paquet's bid for

the bridge painting work included an inflated amount of cost, overhead, and anticipated profit while other bid items contained an understated amount of cost, overhead, and anticipated profit. It also is undisputed that Paquet's claim for compensation arose from those "unbalanced" bid items. However, because the phrase "claim for additional compensation" may be subject to varying interpretations, we find Specification 102.08 ambiguous.

" 'An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations.' " *Nester v. O'Donnell,* 301 *N.J.Super.* 198, 210, 693 *A.*2d 1214 (1997) (citation omitted). Generally, the terms of an agreement are to be given their plain and ordinary meaning. *Ibid.* The term "additional" is defined in *Webster's Third New International Dictionary* 24 (1971) as "existing or coming by way of addition." *Webster's* defines the term "addition" as "[t]he result of adding: anything added: INCREASE, AUGMENTATION." By its plain meaning, the phrase "claim for additional compensation" means a claim for "increased" or "augmented" compensation.

Paquet asserts that it is not seeking "additional compensation" because it is not seeking "increased" or "augmented" compensation over the original contract price. Rather, it seeks compensation only for the non-bridge painting work in the contract that it has completed and for which the DOT promised to pay when the parties entered into the contract.

The contract stated that $826,473.50 was to be paid to Paquet for the bridge painting work, an amount based on the first subcontractor bid that Paquet received for the work. Because Paquet received a second, significantly lower subcontractor bid for the bridge painting work close to the submission deadline, it retained the $826,473.50 figure for the bridge painting work in the contract. Paquet then took the difference between the $826,473.50 amount and what it would ultimately charge the DOT for the bridge painting [2], and subtracted that difference from

---

[2] We assume that Paquet added its customary thirty percent markup to the second subcontractor's bid ($450,414). $450,414 plus thirty percent ($135,124) is

other non-bridge painting pay items set forth in the contract to offset the inflated $826,473.50 figure. Stated differently, the $826,473.50 figure represents Paquet's compensation for both the pay items of bridge painting work and for the non-bridge painting pay items that Paquet understated.

Thus, by requesting that the entire $826,473.50 amount not be deleted from the contract, Paquet contends that it is not making a "claim for additional compensation" from the DOT. Instead, Paquet is requesting that portion of the $826,473.50 that represents its payment for the non-bridge painting pay items that it understated. That sum is compensation for work that has not been deleted from the contract by the DOT—work that Paquet has performed and for which the DOT is contractually obligated to pay. It is not "increased" or "augmented" compensation, because the DOT, and ultimately the New Jersey taxpayer, will not pay any more under the contract than it would have paid if the new OSHA regulations had not been promulgated. In light of the plain meaning of the term "additional," Paquet's interpretation of the phrase "claim for additional compensation" is reasonable.

The DOT asserts, and the Appellate Division held, that the phrase "claim for additional compensation" applies to the facts of this appeal because Specification 102.08 "warn[s] the bidder that [it] can make *no claim* based on the fact that [it] has disproportionately allocated cost, overhead and profit among the various pay items." *Paquet, supra,* 335 *N.J.Super.* at 140, 761 *A.*2d 122 (emphasis added). Thus, the phrase arguably encompasses the facts here—a contractor who submits a bid containing both an inflated bid item and an offsetting, understated bid item. The

approximately $585,000. We also assume that Paquet took the difference between $826,473.50 and $585,000, which is approximately $241,000, and subtracted that amount from non-bridge painting items in the contract. The record does not indicate the precise amount that Paquet subtracted from the non-bridge painting items. We make these observations because they provide context for our analysis. Precisely because they are assumptions made on this incomplete record, they are subject to further review on remand. See *infra* at 400, 794 *A.*2d at 154.

inflated bid item is deleted subsequently and the contractor requests compensation for the portion of the inflated bid item that represents the remainder of the contractor's compensation for the understated bid item.

The DOT considers it of no moment that the payment sought by Paquet is not compensation over and above the original contract price in that Paquet would have received the payment had the inflated bid item not been deleted from the contract. Rather, the gravamen of the DOT's claim is that Paquet's claim for compensation arose from an unbalanced bid item or items.

Although Paquet's interpretation is reasonable, the DOT's interpretation of the phrase "claim for additional compensation" also is plausible. First, while Paquet is not seeking compensation above the original contract price, it is requesting compensation above the amount of the understated bid items. Accordingly, the plain meaning of additional—"increased" or "augmented"—arguably could apply to the instant case. Second, the DOT's interpretation bolsters Specification 102.08's edict that pay items in a bid accurately reflect the actual cost of the work to be performed.

We conclude that because the phrase "claim for additional compensation" is subject to more than one reasonable interpretation, Specification 102.08 is ambiguous. Where a court determines that an ambiguity exists in a government contract, the writing is to be strictly construed against the draftsman, the government entity. *SMC Corp. v. New Jersey Water Supply Auth.*, 334 *N.J.Super.* 429, 434–35, 759 *A.*2d 1223 (App.Div.2000) (quoting *Terminal Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth.*, 18 *N.J.* 294, 302, 113 *A.*2d 787 (1955)). Because we find that Specification 102.08 is ambiguous and must be construed against the DOT, we conclude that that specification does not bar Paquet from seeking an equitable adjustment from the DOT.

Moreover, even if there were no such ambiguity, independent equitable grounds also require that Paquet receive an equitable

adjustment from the DOT. That remedy keeps the contractor " 'whole when the Government modifies [a] contract.' " *General Ry., supra,* 875 *F.*2d at 324–25 (citation omitted).

█ The rationale for prohibiting contractors from receiving additional compensation arising from an unbalanced bid is to deter contractors from submitting such bids, *Paquet, supra,* 335 *N.J.Super.* at 140, 761 *A.*2d 122, and, we surmise, to penalize them for doing so. The practice of submitting unbalanced bids is " 'admittedly susceptible of fraud and collusion.' " *Id.* at 138, 761 *A.*2d 122 (quoting *Armaniaco v. Cresskill,* 62 *N.J.Super.* 476, 482, 163 *A.*2d 379 (1960)). Moreover, the practice " 'carr[ies] the additional danger of placing an irresponsible bidder in a position of bidding higher on the earlier work to be done under the contract and lower on the latter [sic] work. Such a bidder could, after having taken his profit out of his early payments on a job, fail to complete the work called for.' " *Ibid.* (quoting *Armaniaco, supra,* 62 *N.J.Super.* at 482, 163 *A.*2d 379). That practice commonly is known as "front-end loading." Typically, a front-end loaded bid contains inflated bid items for work to be completed at the beginning of a contract and subsequent offsetting, understated bid items for work to be completed later in the contract. *See Paquet, supra,* 335 *N.J.Super.* at 138, 761 *A.*2d 122. Public entities generally disfavor front-end loaded bids because of the contractor's incentive to collect its profits early in the contract and then abandon the remainder of the contract. *See Ibid.*

Because there is no evidence of fraud, collusion or front-end loading in this record, the above concerns are not present here. Indeed, the two lower courts remarked that Paquet's imbalance was not attributable to any apparent machinations. As the trial court noted, "I see the potential for shenanigans. . . . In this case, it's not there[.]" The Appellate Division agreed, stating that "[w]e do not suggest that Paquet harbored an evil or corrupt motive." *Paquet, supra,* 335 *N.J.Super.* at 144, 761 *A.*2d 122. Although Paquet's bid contained both inflated and understated pay items characteristic of front-end loaded contracts, Paquet's overstated

bid item—the bridge painting work—was scheduled to be completed near the end of the project, unlike front-end loaded contracts.

We note also that the submission of unbalanced bids distorts the public bidding process and may make a " 'mockery of fair competition between bidders.' " *Paquet, supra,* 335 *N.J.Super.* at 138, 761 *A.*2d 122 (quoting *Armaniaco, supra,* 62 *N.J.Super.* at 488, 163 *A.*2d 379 (Conford, J., concurring)). However, there is no evidence of unfair competition among bidders in this appeal. Paquet did not understate certain pay items for the purpose of circumventing the competition; rather, it understated those pay items to offset the inflated cost of the bridge painting work.

Accordingly, the policy reasons undergirding the prohibition of unbalanced bids, to guard against fraud, collusion, front-end loaded bids and the deterioration of fair competition, are not implicated in this appeal. Because Paquet did not submit its unbalanced bid with any illicit motive, we see no justification for penalizing it for doing so. Further, given the unique facts of this case, we do not anticipate that our holding will diminish Specification 102.08's deterrent effect on contractors who do submit unbalanced bids intending to manipulate the system to their advantage.

Finally, the DOT would be unjustly enriched if it were permitted to delete the entire cost of the bridge painting work. The plain fact is that Paquet performed hundreds of thousands of dollars worth of work for which it was not compensated. Alternatively, if the DOT compensates Paquet for the non-bridge painting work that Paquet has completed, the DOT, as well as New Jersey taxpayers, will not pay any more under the contract than would have been paid in the absence of the revised OSHA regulations. Fairness dictates that Paquet be compensated for its costs of completed work. In other words, Paquet is entitled to an equitable adjustment.

Our holding is limited to the unique facts of this appeal. We permit an equitable adjustment only because unforeseen governmental regulations changed the amount of work to be completed by Paquet and because Paquet harbored no improper motives in

submitting its unbalanced bid. Moreover, the DOT will not be required to pay any more compensation to Paquet than it was required to pay under the original contract. Such aggregated circumstances are unlikely to recur.

## IV

Because the trial court noted that its determination was without "mathematical certainty" and because of the incomplete record, we remand the matter to the trial court for a determination of the amount of the equitable adjustment. However, because the record reveals that there is disagreement and controversy over that amount, we provide brief guidance to the trial court and to the parties in respect of that determination.

The record is unclear concerning a number of issues, including the exact amount Paquet subtracted from certain non-bridge painting items in the contract to offset the inflated amount of $826,473.50 for the bridge painting work. On remand, the trial court should determine that amount because that amount is, presumptively, the starting point for the appropriate equitable adjustment. We note, in that connection, that because Paquet did not perform any bridge painting work, it is not entitled to its customary thirty percent markup for overhead and profit for such work.

Mindful of the vagaries of these facts, the incomplete record, and the lack of full briefing on the subject, we emphasize that our guidance is only that. We repose in the trial court the task of determining the appropriate equitable adjustment after it has the benefit of whatever procedures it may establish for the submission of briefs and affidavits, or for conducting a hearing on the issue.

The decision of the Appellate Division is affirmed in part and reversed in part and the matter is remanded to the trial court for a determination of the amount of the equitable adjustment.

*For affirmance in part; reversal in part*—Chief Justice PORITZ, and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.