**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0011-24

MAIN STREET NEAL, LLC and
YO ANTHONY, LLC,

     Plaintiffs-Appellants,

v.

JM40, LLC,

     Defendant-Respondent.

_____

Submitted May 29, 2025 – Decided July 31, 2025

Before Judges Currier and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. LT-000994-24.

Law Office of John Carrino, LLC, attorneys for appellants (Brenton J. LaMaire, on the briefs).

Lombardi and Lombardi, PA, attorneys for respondent (Scott A. Telson, on the brief).

PER CURIAM

Plaintiffs, Main Street Neal, LLC and Yo Anthony, LLC, (Landlord) appeal from a July 25, 2024 order dismissing their complaint for possession following a bench trial. Although we do not disturb the trial court's factual findings that defendant JM40, LLC (Tenant) did not violate the parties' Lease by failing to maintain and repair the leasehold, we nonetheless are constrained to vacate the order of dismissal because we conclude the trial court erred in not considering the non-waiver clause under the Lease.

The parties have a written commercial lease. Tenant leases Landlord's "Premises" for "a restaurant with bar and banquet facility and ancillary businesses." In pertinent part, the Lease provides:

> 5. Repairs and Care. (A) . . . The Tenant will take good care of the Premises and will maintain the Premises in good condition and state of repair . . . . The [T]enant will neither encumber nor obstruct the . . . entrances, hallways and stairs, but will keep and maintain the same in a clean condition, free from debris, trash, refuse . . . .
>
> (B) Tenant shall be responsible for the maintenance and service of all systems, including but not limited to the HVAC, electrical, plumbing, sprinkler, elevator, refrigeration, alarm, etc. . . . All repairs and maintenance, including glass, are the responsibility of the Tenant. For any such repair or maintenance issue that will exceed the cost of $1,000[], Tenant must notify Landlord prior to commencement of remediation of any such issue . . . .

2

(C) The Landlord shall be responsible for roof repair and structural repairs.

6.   Alterations and improvements.   The Tenant may undertake any alterations, additions or improvements and may install or upgrade climate regulation, air conditioning, cooling, heating and sprinkler systems, television or radio antennas, heavy equipment, apparatus and fixtures, with the written consent of the Landlord, which shall be liberally given.  . . .

. . . .

10.   Assignment.   . . . Tenant shall not assign or encumber this Lease or sublet or sublease the Premises to any third party without the prior written consent of the Landlord, which consent shall not be unreasonably withheld.  . . .

. . . .

16.  Reimbursement of Landlord/Tenant.  If the Tenant fails or refuses to comply with any of the terms and conditions of this Lease, the Landlord may carry out and perform such conditions at the cost and expense of the Tenant, which amounts will be payable on demand to the Landlord.  This remedy will be in addition to such other remedies as the Landlord may have by reason of the breach by the Tenant of any terms and conditions of this Lease.  . . .

. . . .

21.   Events of Default; Remedies upon Tenant's Default.  The following are "events of Default" under this Lease:

. . . .

A-0011-24

(b) a default by the Tenant in the performance of any of the other covenants or conditions of this Lease, which the Tenant does not cure within thirty (90)[1] days after the Landlord gives the Tenant written notice of such default;

. . . .

If an Event of Default occurs, the Landlord, in addition to any other remedies contained in this Lease or as may be permitted by law, may, without being liable for prosecution therefore, or for damages, re-enter, possess and enjoy the Premises. . . .

. . . .

22.  Termination of Default.  If an Event of Default occurs, the Landlord may, at any time thereafter, terminate this Lease and the term hereof . . . .

. . . .

24.  Non-Waiver by Landlord.  The various rights, remedies, options and elections of the Landlord under this Lease are cumulative.  The failure of the Landlord to enforce strict performance by the Tenant of the conditions and covenants of this Lease or to exercise any election or option, or to resort or have recourse to any remedy conferred in this Lease or the acceptance by the Landlord of any installment of rent after any breach by the Tenant, in any one or more instances, will not be construed or deemed to be a waiver or a relinquishment for the future by the Landlord of any

---

[1]  We recognize the discrepancy in the Lease language; it was not raised by the parties as an issue in the trial.

A-0011-24

such conditions and covenants, options, elections or remedies, but the same will continue in full force and effect.

. . . .

27.  Notices.  All notices required under the terms of this Lease will be given and will be complete by mailing such notices by certified mail, return receipt requested, or by hand delivery . . . .

. . . .

29.  Entire Contract.  This Lease contains the entire contract between the parties.  . . . No additions, changes or modifications, renewals or extensions hereof, will be binding unless reduced to writing and signed by the Landlord and the Tenant.

In December 2023, Landlord served Tenant with a "Notice to Cease."  The notice warned that if Tenant "d[id] not immediately cease . . . doing the acts complained of, [it] may be EVICTED."  The notice listed various acts or violations of the Lease and advised Tenant that "if [it] d[i]d not cease all abovementioned violations by January 30, 2024, . . . [it] will be evicted from the Premises according to law."

In January 2024, Landlord served Tenant with "Notice to Quit Demand for Possession."  The January notice repeated the same acts and violations stated in the December notice.

5

In May 2024, Landlord filed a complaint against Tenant. The complaint stated "Landlord had a Notice to Cease served on Tenant" and "Tenant did not respond," and "had a Notice to Quit & Demand for Possession served on Tenant . . . Tenant did not respond to this Notice and has not vacated the Premises." Landlord attached both notices as exhibits to the complaint.

Landlord sought a "judgment for possession for the . . . reasons stated in the notices attached to th[e c]omplaint." Landlord alleged Tenant was in:

> a. Violation of paragraph 5(A) of the Lease by failing to maintain the Premises in good condition and repair, including failing to make necessary repairs, after service of a Notice to Cease;
>
> b. Violation of paragraph 5(A) of the Lease by continuously encumbering and obstructing staircases after service of a Notice to Cease;
>
> c. Violation of paragraph 5(B) of the Lease by continuously failing to make all necessary repairs and perform all necessary maintenance to the Premises after service of a Notice to Cease;
>
> d. Violation of paragraph 5(B) of the Lease by failing to notify Landlord of Tenant's intent to install non-conforming, non-washable ceiling tiles, rip up tile and part of a bar, remove building materials, and commence restoration and remodeling services before obtaining Landlord's approval to commence same when each of the aforementioned repairs cost more than $1,000[];
>
> . . . .

6

f. Violation of paragraphs 3 and 9 of the Lease by continuously allowing a person to stay at the Premises overnight like a quasi-residential tenant where the sole permitted use of the Premises is as a restaurant with a bar and banquet facility and ancillary businesses.

Landlord alleged "Tenant has not surrendered possession of the Premises and . . . continues in possession of the Premises without . . . consent . . . ."

On July 25, 2024, the trial court conducted a one-day bench trial. The Landlord produced Anthony Ianiello as its only witness. Ianiello is a member of the Landlord entities.

Ianiello testified that Landlord performed tasks under the Lease that were Tenant's responsibility. He explained he had: (1) his contractor fix "crumbled up concrete at the ramp going into the restaurant"; (2) "to fix the railing on the back deck coming out of the kitchen" and "fix the stairs coming . . . out of that deck"; (3) to fix "warped and broken" steps on the deck which served as an "entrance to the back door"; and (4) to replace "non-conforming tile" used by Tenant on the first floor. Ianiello admitted that before Landlord served the Notice to Cease, it "agreed to facilitate making . . . repairs." He testified the Tenant did not reimburse the Landlord for these costs and expenses. Ianiello further testified that Tenant failed to repair "urinals upstairs that had been broken for probably six months."

A-0011-24

Ianiello stated that Tenant, without notice to Landlord and without Landlord's permission: (1) "installed a non-conforming ceiling in the bar area"; (2) "demo[lishe]d the whole restaurant"; (3) "took all the alarm system out"; (4) "demo[lishe]d all the electricity that was in the ceiling on the first floor"; (5) "demo[lished] and rebuil[t] the whole bar"; and (6) improperly installed a water heater. He noted the hot water heater was installed after the filing of the complaint. He testified the cost of this work exceeded $1,000. He also testified Tenant "change[d] the locks on the doors without" notice.

In addition, Ianiello stated that Tenant "encumbered or obstructed . . . entrances, hallways [and] stair[]wells" by storing materials. As to the obstructions, Ianiello testified that Tenant: (1) stored dough racks near the elevator "on occasion"; (2) had a ladder in a stairwell but it was no longer there; and (3) had a "bush or tree" in the stairwell but "after the Notice to Quit . . . things became better." Ianiello stated he had no "firsthand knowledge" if the materials were stored after Tenant was served with the Notice to Quit.

Lastly, Ianiello testified Tenant violated the Lease by having "[h]is maintenance man . . . living" on the Premises. Ianiello thought the person lived in the shed, which he described as a "fire hazard."

A-0011-24

On cross-examination, the following exchange occurred:

Q. Is the . . . stairs and the railings structural, sir?

A. No.

Q. Is the deck structural?

A. No.

Q. The stairs and railing leading to the back of the kitchen, are they structural?

A. No.

Q. The concrete ramp leading to the front entrance, is that structural?

A. No.

Q. The stairs leading down to the basement, is that structural?

A. The stairs themselves are structural.

Other than this testimony, Ianiello did not provide a definition of the term "structural" as used in the Lease.

As to the maintenance man, Ianiello acknowledged the man had worked for Landlord prior to the Lease with Tenant. Further, there were "occasions where he . . . might have crashed there" during the Landlord's occupancy. He agreed the photos presented at trial did not show anyone living there.

9

Tenant produced John Donald, its managing member, to testify. Donald testified that Tenant "adequately maintained the property." He stated Tenant hired "contractors, electricians, [and] licensed plumbers" to do all the maintenance.

As to the installation of the hot water heater, Donald stated he advised the Landlord "[t]hrough passing" that he was installing the hot water heater. He explained the Landlord did not object and "agreed . . . a new one" was needed.

With regard to the urinals, Donald stated the two urinals in question were replaced, however, "the two urinals in question have been covered up because . . . when somebody flushes . . ., the[re is a] leak . . . inside the walls, which the plumber is getting the parts . . . to fix." Donald stated Tenant always had the intent to fix the toilets and urinals.

Donald acknowledged "lining up dough boxes next to [the] elevator." However, he stated this was not the practice any longer. He further testified that the ladder and plant were no longer in the stairwell.

Donald stated Landlord never asked Tenant "to make repairs to . . . the deck or railings or staircases," including the "concrete ramp leading to the front entrance." Instead, he explained "[t]he [L]andlord said he would take care of it."

10

As to "[t]he stairs leading down to the basement," Donald stated he understood "concrete [wa]s structur[al]" and he "asked [Landlord] to fix it." However, Landlord did not fix the stairs.

Donald denied doing any work on the alarm system or "removing wiring of the fire system," instead stating Landlord's contractor conducted that work. Further, regarding the ceiling tile, Donald testified that Landlord stated it "changed the tiles because" the new tiles "are better . . . . [Landlord] took care of that for" him.

Donald testified he told Landlord about changing the locks "in passing." He noted "people get . . . terminated, and [you] have to change the locks."

As to the maintenance man, Donald stated Landlord told him "[h]e kind of comes with the building. It's an extra set of eyes on your building." Donald admitted the man "might have" "intermittently crash[ed] at [the P]remises" but he "left the building just like" Landlord had it.

Donald testified that Landlord was "told" about the work on the bar. He explained Tenant installed "granite and . . . waterproofing," "put a new sink in," and had electrical work done by an electrician and plumbing by a licensed plumber.

11

On cross-examination, Donald admitted Tenant only obtained verbal, not written, permission for the repairs and maintenance it performed. Further, he admitted that prior to the Notice to Quit "encumbrances existed on the property."

As to the urinals, he noted he requested Landlord to fix them because the repair included work "inside the walls." He explained that when "dealing . . . inside the walls, [it] is structure." Nevertheless, he stated "[o]nce [Landlord] refused to fix them, [he] hired the plumber to fix it."

In an oral opinion, the trial court first reviewed the procedural history and applicable Lease terms. The court noted Landlord had the burden—by the preponderance of the evidence—to establish the alleged violations and the right to possession.

The trial court stated the parties disputed the term "structural" as used in the Lease. The court noted that neither of the witnesses were "engineers" or "experts." The court also noted Donald's testimony that "in order to be able to fix the urinals," you had "to go within the walls." The court stated it was unclear whether going into the walls was "structural or not."

The trial court further stated that no witness offered the Lease's definition of "structural," but the "Oxford language's definition in the dictionary of structural is relating to or forming part of the structure of a building or other

12

item."  Nevertheless, the court held "whether or not having to break into the walls to be able to fix the plumbing[,] that[ i]s going to fix the urinal is structural or not" is an issue left for an expert.  Moreover, the court observed "as of right now, there are other urinals that do work within the facility."

The court noted the issue regarding the hot water heater was not part of Landlord's complaint, but there was testimony regarding the heater.  The court stated Tenant never advised Landlord that the heater was going to be installed and the costs exceeded $1,000.

The court held that "as to whether there was an actual violation of the [L]ease agreement that justifies . . . issuing a judgment for possession today, . . . [Landlord] . . . failed to meet their burden."  The court further stated, "whether there was a true violation of the [L]ease agreement that justifies a judgment for possession being entered today, I do[ no]t find . . . [Landlord] has met their burden of doing so."  The court explained:

> As to a violation of 5A and 5B, whether they failed to maintain the [P]remises in good repair, failed to make necessary repairs, and continuously failed to make all necessary repairs and perform all necessary maintenance to the [P]remises, I do[ no]t find . . . [Landlord] has met their burden of proving that after the service of the Notice to Cease [Tenant] continuously failed to do so.

A-0011-24

The only evidence that was presented to this [c]ourt that there were failures to make certain repairs to certain things, . . . after the fact, I have pictures. All the pictures I have in evidence were pic[ture]s—other than the pictures that were admitted by . . . [Tenant], [—]all the pictures that were admitted by . . . plaintiff were all pictures taken prior to the Notice to Cease going out. . . .

So I do[ no]t have any pictures of what the property looked like within the last couple of months even to say that there were encumbrances or there were[ no]t encumbrances or that there were things that needed to be repaired that were[ no]t repaired.

All I have to go off of to say that . . . [Tenant] failed to maintain the [P]remises in good repair is . . . Ianiello's word.

. . . .

Also with relation to their violation of 5A, by continuously encumbering and obstructing the staircases, . . . Donald testified that all the pictures that were presented, again by . . . [Landlord], that showed what the property looked like before the Notice to Cease went out, all of that has been removed.

And, again, . . . Ianiello testified that as of a month ago, he did see certain encumbrances. I have no photographs. I have nothing from which I can make a determination that . . . is in fact so.

. . . [I]t[ i]s [Landlord]'s burden to . . . demonstrate that . . . it has remained encumbered and the staircases are still obstructed, and they failed to do so.

14

As to the maintenance man staying on Premises, the trial court found "there[ wa]s simply no evidence that . . . person is still there." The court found it was significant that Landlord was "aware that th[e] person was remaining at the property when he" occupied it. Nevertheless, the court found "the individual, . . . ha[d] already left the [P]remises. So there is no evidence . . . the person is still there."

Finally, the trial court noted that the Lease requires Tenant to provide written notice to and receive written consent from Landlord to make alterations and improvements. However, the court stated, "the parties did[ no]t really operate within the terms of the [L]ease agreement." "[N]othing between the parties, other than the [L]ease agreement, appear to be in writing. . . . [T]his is the way that they were operating." The court explained it would look beyond "the four corners of the agreement, . . . at the parties' actions throughout the . . . tenancy."

The trial court denied the judgment of possession and dismissed Landlord's complaint with prejudice.

On appeal, Landlord contends the trial court erred because Tenant violated the Lease by failing to: (1) "notify [Landlord] of its intent to make repairs that cost over $1,000[] and by failing to obtain [Landlord]'s written permission to

15

perform alterations, additions, or improvements, and [Landlord] did not waive [its] rights to enforce those provisions of the parties' Lease"; and (2) "repair and maintain urinals in good condition and state of repair because the Lease explicitly requires them to do so and because the need to go through a wall to make the repair does not render the repair a 'structural' repair."

Our review of a final determination made following a bench trial is "subject to a limited and well-established scope of review." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). We do not disturb a trial court's findings of fact "unless convinced that those findings and conclusions [a]re 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Griepenburg v. Twp. Of Ocean, 220 N.J. 239, 254 (2015) (quoting Rova Farms Resort v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Therefore, a trial court's factual findings are "considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms, 65 N.J. at 484.

"To the extent that the trial court's decision constitutes a legal determination, we review it de novo." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). "A trial court's interpretation of the law and the legal consequences

16

that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A lease is a contract that sets forth the rights and obligations of the parties. See Town of Kearny v. Disc. City of Old Bridge, Inc., 205 N.J. 386, 411 (2011). "The interpretation and construction of a contract is a matter of law for the trial court, subject to de novo review on appeal." Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 438 (App. Div. 2016). "Accordingly, we pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

"The objective in construing a . . . contract . . . is to determine the intent of the parties." Ibid. (quoting Mantilla v. NC Mall Assocs., 167 N.J. 262, 272 (2001)). A court "simply interpret[s]; it [does] not . . . rewrite a contract for the parties better than or different from the one they wrote for themselves." Ibid. Therefore, "we should give contractual terms 'their plain and ordinary meaning,' unless specialized language is used peculiar to a particular trade, profession or industry." Ibid. (quoting M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002)). "This common-sense approach often begins with an examination of dictionary definitions." Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 426 (2016).

When a "lessor or lessee fails to perform a covenant on his [or her] part to do or refrain from doing a stipulated thing, the injured party may maintain an action for the breach" of contract. Cohen v. Wozniak, 16 N.J. Super. 510, 512 (Ch. Div. 1951). The party asserting a breach bears the burden by a preponderance of the evidence. See Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016).

Parties to a lease can waive contract provisions. See Home Owners Constr. Co. v. Glen Rock, 34 N.J. 305, 316 (1961). Under New Jersey law, waiver

> is the voluntary and intentional relinquishment of a known right. An effective waiver requires a party to have full knowledge of his [or her] legal rights and intent to surrender those rights. The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference. The party waiving a known right must do so clearly, unequivocally, and decisively.
>
> [Knorr v. Smeal, 178 N.J. 169, 177 (2003) (internal citations omitted).]

"Waiver is never presumed." Cole v. Jersey City Med. Ctr., 215 N.J. 265, 276 (2013). A party claiming another has waived a right, bears the burden of establishing that waiver by "clear and convincing" evidence. Home Owners

Constr. Co., 34 N.J. at 317. "The issue of whether a party waived its . . . right is a legal determination subject to de novo review." Cole, 215 N.J. at 275.

1.

Landlord contends Tenant "breached the Lease by failing to repair and maintain the urinals in good condition and state of repair because the Lease explicitly requires them to do so and because the need to go through a wall to make the repair does not render the repair a 'structural repair.'"

We conclude Landlord's contentions are misplaced for three reasons: (1) the trial court made factual findings supported by the evidence in the record; (2) the parties failed to provide any definition of the term "structural" as used in their Lease and the court correctly sought the term's "plain and ordinary meaning," M.J. Paquet, 171 N.J. at 396, by using the dictionary definition, Cypress Point Condo. Ass'n, 226 N.J. at 426; and (3) the court stated it could not find the repairs were structural without the benefit of expert testimony.

The trial court found it was "undisputed . . . a couple of [the] urinals within the . . . men's bathroom . . . are not working at this time." "But as of right now, there are other urinals that do work within the facility." Therefore, the court determined Landlord did not establish Tenant violated the parties' Lease. These

19

factual findings are adequately supported in the record and the court's conclusion will not be disturbed.

Further, the trial court stated it was unable to determine which party was responsible for the repair of the urinals because the parties' disputed the term "structural" as used in their Lease. As to the structural nature of the repair, Landlord argues the trial court should have followed the definition of "structural repair" as explained by the New Jersey Supreme Court in Bertsch v. Small Investments, Inc., 4 N.J. 520 (1950), and Spinelli v. Golda, 6 N.J. 68 (1950).

In Bertsch, after considering the testimony of "[a] qualified architect with fifteen years of experience," 4 N.J. at 523; and an expert architect, id. at 522, the Court concluded the "repair[] and reconstruct[ion of] a parapet wall on the roof of a building," id. at 521; was not a violation "of a structural nature" as envisioned in the parties' "contract for sale." Ibid.

The Court held:

> A structural change has been construed to mean such a change as to affect a vital and substantial portion of the premises or a change of its characteristic appearance, the fundamental purpose of its creation or the uses contemplated, or a change of such a nature as would affect the realty itself, extraordinary in scope and effect and unusual in expenditure.
>
> [Id. at 524.]

Landlord argues "the trial court should have rendered some interpretation of the term structural and such interpretation should have been in line with Spinelli and Bertsch." Further, "[i]f the trial court had interpreted 'structural' to mean a vital and substantial portion of the [P]remises or its characteristic appearance, the trial court could not have deemed repairs to a urinal and the connected plumbing as structural repairs." Landlord argues the trial court should have reached this conclusion, "regardless of whether such repair required going into the wall to repair the urinals' plumbing as [Tenant] alleged."

Neither Landlord nor Tenant offered any evidence regarding the definition of "structural" used in their Lease. Landlord did not request the trial court to use the Spinelli/Bertsch definition. Under these circumstances, we conclude the court did not err by using the dictionary definition. See Cypress Point Condo. Ass'n, 226 N.J. at 426.

Further, given Landlord's failure to produce an expert or, at the very least, a witness to describe the nature and effect of the work, the definition of what "structural" meant, by itself, would not have provided any assistance to the court. Whether the urinal repairs rose to the level of structural repairs, could not be determined by the trial court because the parties were not "engineers" and

there was no expert testimony presented to explain the nature, extent and effect of the repairs.

The purpose of admitting expert testimony is to "assist the trier of fact to understand the evidence or to determine a fact in issue," N.J.R.E. 702, by presenting testimony "concern[ing] a subject matter that is beyond the ken of the average juror." Polzo v. Cnty. of Essex, 196 N.J. 569, 582 (2008).  We see no error in the court's determination that whether the repairs were structural could only be resolved through expert opinion.  In other words, the nature of the repairs was beyond its understanding without expert testimony.  See ibid.  The court properly concluded Landlord did not sustain its burden.

2.

Landlord contends Tenant "breached the Lease by failing to notify [it] (in writing) of its intent to make repairs that cost over $1,000[] and by failing to obtain [Landlord]'s written permission to perform alterations, additions or improvements, and [it] did not waive [its] rights to enforce those provisions of the parties' Lease."

We note the Lease provides:  (1) "[f]or any . . . repair or maintenance issue that will exceed the cost of $1,000[], Tenant must notify Landlord prior to commencement of remediation of any such issue"; (2) "[a]ll notices required

22

. . . will be given and will be complete by mail[]"; (3) Tenant "may undertake" certain "alterations, additions or improvements and may install or upgrade" other systems and apparatus, however it may only do so "with the written consent of the Landlord"; and (4) a non-waiver clause providing the Landlord's failure to require "strict performance" by Tenant under Lease could not "be construed or deemed to be a waiver or relinquishment for the future by the Landlord of any" rights.

In considering the parties' course of conduct—Tenant not notifying Landlord of maintenance and repairs in excess of $1,000 or obtaining Landlord's written consent regarding certain alterations, additions and improvements—the court looked beyond "the four corners of the agreement" and instead considered "the parties[']  actions throughout the . . . tenancy."

However, by looking beyond the Lease, the trial court omitted consideration of the non-waiver clause. The parties agree they did not comply with the written notices and consent. However, Landlord refutes whether it waived those provisions. The trial court, as the factfinder, must determine the credibility of the witnesses on this issue, apply the correct burden of proof, and determine whether Tenant established waiver.

Therefore, we are constrained to vacate the order dismissing the complaint and remand for the trial court to consider the non-waiver clause and re-issue its decision and order.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

24