**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3730-19
                A-3754-19

MONTANA CONSTRUCTION,
CORP.,

      Plaintiff-Appellant,

v.

JERSEY CITY MUNICIPAL
UTILITIES AUTHORITY and
SPINIELLO INFRASTRUCTURE
WORLDWIDE,

      Defendants-Respondents.

_____

RAVI MEHTA,

      Plaintiff-Appellant,

v.

JERSEY CITY MUNICIPAL
UTILITIES AUTHORITY and
SPINIELLO INFRASTRUCTURE
WORLDWIDE,

      Defendants-Respondents.

_____

Argued January 21, 2021 – Decided April 15, 2021

Before Judges Sumners and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket Nos. L-1687-20 and L-1895-20.

George E. Pallas argued the cause for appellants (Cohen, Seglias, Pallas, Greenhall & Furman, PC, attorneys; George E. Pallas and Michael F. McKenna on the briefs).

Benjamin Clarke argued the cause for respondent Jersey City Municipal Utilities Authority (DeCotiis, Fitzpatrick, Cole & Giblin, LLP, attorneys; Benjamin Clarke and Gregory J. Hazley, on the brief).

Edward B. Deutsch argued the cause for respondents Spiniello Infrastructure Worldwide (McElroy, Deutsch, Mulvaney & Carpenter, LLP, and Lydia K. Deutsch (McElroy, Deutsch, Mulvaney & Carpenter, LLP) of the New York bar, admitted pro hac vice, attorneys; Edward B. Deutsch, Edward J. DePascale, and Lydia K. Deutsch, on the brief).

Adrienne L. Isacoff argued the cause for amicus curiae Utility and Transportation Contractors Association of New Jersey, Inc. (Florio, Perrucci, Steinhardt, Cappelli, Tipton & Taylor, LLC, attorneys; Adrienne L. Isacoff, on the brief).

PER CURIAM

In these consolidated appeals, we must determine whether the Law Division orders of May 26, 2020 and June 1, 2020 correctly upheld the decision

by defendant Jersey City Municipal Utilities Authority (JCMUA or Authority) to award a publicly bid contract for repairs and improvements to Jersey City's sewer and water lines to defendant Spiniello Infrastructure Worldwide (Spiniello). JCMUA rejected the lowest bid by plaintiff Montana Construction Corp. (Montana) as non-responsive and awarded the contract to the next lowest responsible bidder, Spiniello. We affirm.

I.

A. Public Bid Invitation/Specifications

On March 3, 2020, the JCMUA advertised and solicited bids for the Phase 1 & 2 Infrastructure Rehabilitation Project (hereinafter "project") of its sewer and water lines in accordance with the Local Public Contracts Law, N.J.S.A. 40A:11-1 to -52. Relevant to this dispute are several provisions of the bid specifications.

In Section 00100 00116A of the bid specifications, JCMUA reserved the right to reject all materially unbalanced bids, stating:

> The amount bid for each pay Item in the Bid <u>shall reflect the actual cost</u> the Bidder reasonabl[y] anticipates that performance of that pay Item will entail, together with a proportional share of the cost to perform Work for which no separate pay Item is provided and a proportional share of the Bidder's anticipated overhead and profit. <u>Bids that are, in the</u>

A-3730-19

sole discretion of the Owner, materially unbalanced, will be considered unresponsive.

[(emphasis added).]

This same provision defined materially unbalanced as when:

the Bid is structured on the basis of nominal prices for some items and [] inflated prices for other items creating, in the sole judgment of the Owner, reasonably exercised, the possibility that: 1) progress payments for items completed early may result in the unpaid project balance being insufficient to complete . . . the Work and/or 2) award to the Bidder will not result in the lowest ultimate cost to the Owner, taking into consideration the reasonable potential for adjustment of quantities including, but not limited to, "If and Where Directed" items and quantities.

[(emphasis added).]

Regarding the listing of subcontractors, the bid specifications provided:

Before submitting his bid, the Bidder shall completely familiarize himself with Section 40A:11-16 of the New Jersey Local Public Contracts Law (New Jersey Statutes Annotated 40A:11-16). On contracts for the erection, alteration or repair of any public building, if the Bidder will use subcontractors for the plumbing work and gas fitting and all kindred work, steam and hot water heating and ventilating apparatus, steam power plants and kindred work, electrical work, structural steel and ornamental iron work[,] he shall list below the name and address of each subcontractor to be used for these respective and kindred categories of work.

All potential bidders who intend to use "in-house" plumbers to perform the plumbing work on the contract are required to comply with N.J.S.A. 45:14C-2 and N.J.A.C. 13:32-1.3. These provisions restrict a licensed master plumber from being utilized as a company employee and applying for a plumbing permit, unless that licensed master plumber holds not less than 10% of the issued corporate stock, or 10% of the partnership capital of a partnership.

In the event the General Contractor will furnish work within the four (4) Specialty Trade Categories listed below with his own salaried non-subcontracted work force, the General Contractor must complete the appropriate space(s) on the Bid form, and submit the required information establishing his own or employee(s)' qualifications in such specialty trade categories.

B. <u>Bid Award</u>

On March 18, 2020, JCMUA received three bids for the project: Montana, $89,367,053; Spiniello, $114,273,300; and J. Fletcher Creamer & Sons, Inc., $128,738,325. Spiniello promptly submitted two letters to the JCMUA protesting Montana's bid, contending it was non-responsive to the bid specifications because it was materially unbalanced due to its nominal bids. After JCMUA provided Montana a copy of Spiniello's protest, Montana submitted a rebuttal to the Authority.

JCMUA's project engineer and outside counsel reviewed the protest submissions and advised the Authority that they agreed with Spiniello that

Montana's bid should be rejected as materially unbalanced. The engineer gave a detailed analysis of Montana's bid, opining that its bid was materially unbalanced because it "[wa]s [f]ront [l]oading" and would "create an unpredictability of costs[.]" Outside counsel joined the engineer's opinion, adding that Montana's bid was "in violation of an express prohibition set forth in the bid specifications, [and] has undermined fair and competitive bidding for the [p]roject . . . ."

At its public meeting on April 23, 2020,[1] the JCMUA Board of Commissioners (Board) solicited public comment but did not accept the invitation by Montana's counsel to question him concerning his client's bid. The Board did not publicly discuss Spiniello's protest and went into executive session under N.J.S.A. 10:4-12(b)(7), to discuss matters relating to "pending or anticipated or contract negation . . . in which the public body is, or may become, a party, or matters falling within the attorney-client privilege." While in closed session, the Board heard the opinions of the project engineer, and JCMUA's general counsel, general consulting engineer, and executive director. Upon returning to public session, the Board– without any commissioners stating their reasons – unanimously voted to reject Montana's bid as materially unbalanced

---

[1] Conducted telephonically due to Covid-19.

A-3730-19

and to award the contract to the "lowest, responsible and complying" bidder, Spiniello.

C. Montana's Litigation

On May 1, 2020, Montana filed a verified complaint in lieu of prerogative writs and order to show cause against defendants seeking to temporarily stay the contract award and to overturn the bid award to Spiniello.[2] Montana contended JCMUA's decision rejecting its bid was arbitrary and capricious and violated the Open Public Meetings Act (Sunshine Law), N.J.S.A. 10:4-6 to -21, by discussing the project bid award in executive session. JCMUA agreed not to award the contract until the litigation was resolved. Spiniello filed a Rule 4:6-2(e) motion to dismiss in lieu of answer, or, in the alternative, a Rule 4:46 motion for summary judgment. JCMUA cross-moved for summary judgment.

On May 26, Assignment Judge Peter F. Bariso, Jr. entered an order, together with a fifty-four-page written decision, denying Montana's application for preliminary injunction; granting Spiniello's motion to dismiss; granting JCMUA's cross-motion for summary judgment; and dismissing Montana's verified complaint with prejudice. The judge found that Section 00100 00116A UNBALANCED BIDS of the bid specifications plainly stated: "[t]he amount

---

[2] Mehta's motion to intervene was denied on May 22, 2020.

bid for each pay Item in the Bid <u>shall reflect the actual cost</u> the Bidder <u>reasonabl[y]</u> anticipates that performance of that pay Item will entail . . . <u>Bids that are, in the sole discretion of the Owner, materially unbalanced, will be considered unresponsive</u>."  (First and third alterations in original).  Thus, the judge rejected Montana's interpretation that the bid specifications allowed bidders "to set bid values as they deemed appropriate based on their business judgment, if and where JCMUA did not state minimum required values."

The judge pointed out JCMUA stressed at oral argument that Montana's material deviation from the bid specifications was evidenced where it "used nominal bids on, at least, 46 of the 232 pay items[.]"  As an example, the judge stated:

> Montana bid $1[] on forty-six-unit price items. Additionally, Montana bid $500[] on ten manhole covers, which is also considered to be a nominal bid for this item.  For example, the Engineer's Estimate for bid item 4H stated the estimated quantity to be 10,000 with a unit price of $225[] for the total amount of $2,250,000[].  Montana bid a unit price of $1[] for a total amount of $10,000[].  Spiniello bid a unit price of $290[] and a total amount of $2,900,000[].  [J. Fletcher Creamer & Sons] bid a unit price of $315[] for a total amount of $3,150,000[].  Accordingly, Montana bid $2,240,000[] less than the lowest estimate for this pay item. Montana's $1[] bids clearly do not reflect the actual cost that Montana reasonably anticipated those pay items to entail.

Finding Montana's bid "unresponsive," the judge decided it lacked standing to challenge the bid award. See William A. Carey & Co. v. Borough of Fair Lawn, 37 N.J. Super. 159, 169 (App. Div. 1955).

Despite finding Montana's bid unresponsive for including nominal bids, for the sake of completeness, Judge Bariso determined whether Montana's bid was materially unbalanced. The judge noted there were minimal discrepancies between the respective analyses by engineers for JCMUA and Montana,[3] but found there was a substantial difference, $15 million, between the estimated actual values of Montana's fifty-six nominal bids and what Montana bid for them.[4] The judge also noted that Montana's bid included inflated prices for some bid items amounting to "at least a $15 [million] difference between the estimated

___

[3] The judge recognized that he was not required to consider a certification by Montana's independent professional engineer because it was not before the JCMUA when it awarded the contract. See Palamar Constr., Inc. v. Pennsauken Twp., 196 N.J. Super. 241, 250 (App. Div. 1983). He considered it, nonetheless.

[4] The report by JCMUA's engineer stated Montana's fifty-six nominal bids totaled $119,672 with actual values of $15,267,950. Montana's engineer certification stated these bids totaled $160,928 with actual total of $16,535,500.

9

value of these items and what Montana bid for them, [thus] it is clear that Montana's bid does contain nominal prices for at least fifty-six items."[5]

Due to these inflated prices and because Section 00290 (Scope of Contract) of the bid specifications provide that the sequence of work is determined by JCMUA, the judge concluded Montana's bid was "front-loaded[.]" For example, he explained that for items related to Blockage Removal and Inspection, "some of the earliest work to be performed under the Bid Specifications[,]" JCMUA's engineer opined the estimate was $1,414,400 in contrast with Montana's $3,088,250 bid. Also, for the first five on JCMUA's schedule, "Montana bid $19,186,550[] for the five bid items that correspond to pipe installation for these streets." JCMUA's engineer found "Montana's bid for those five items was about 21.45 [percent] of the total bid which does not include excavation, backfill, paving and manhole structures." Another concern cited by the judge was the contract end work related to trees and green infrastructure; JCMUA's engineer's estimated cost was $2,170,000, for which Montana only bid $423,400.

---

[5] The report by JCMUA's engineer stated the inflated bid items in Montana's bid totaled $40,706,500 with an estimated cost of $22,150,050. Montana's engineer's certification stated Montana's bid totaled $34,530,000 with an estimated cost of $19,321,250.

The judge next examined Section 00100 00116A (Unbalanced Bids) of the Bid Specifications. The first subpart provides that a materially unbalanced bid exists where "nominal prices for some items and inflated prices for other items" leading to a situation where "progress payments for items completed early may result in the unpaid project balance being insufficient to complete early [and] may result in the unpaid project balance being insufficient to complete [sic] the Work[.]"[6] Given his conclusion that Montana's bid was front-loaded, the judge found it was materially unbalanced and, thus, non-responsive.

In sum, because a governmental entity is without discretion to accept a non-responsive bid, the judge determined JCMUA was legally obligated to reject Montana's bid. See Meadowbrook Carting Co. v. Borough of Island Heights, 138 N.J. 307, 314 (1994).[7]

---

[6] Based on this finding, the judge determined it was not necessary to determine the alternative second subpart under Section 00100 00116A defining a materially unbalanced bid: if the "award to the Bidder will not result in the lowest ultimate cost to the Owner, taking into consideration the reasonable potential for adjustment of quantities including, but not limited to, 'If and Where Directed' items and quantities."

[7] The judge denied Montana's motion to stay the order as did this court and our Supreme Court, Mont. Constr. Corp. v. Jersey City Mun. Utils. Auth., 244 N.J. 287 (2020).

D. Mehta's Litigation

On May 21, 2020, Mehta, represented by Montana's attorneys, filed a verified complaint in lieu of prerogative writs and order to show cause against defendants seeking to temporarily stay the contract award and to overturn the bid award to Spiniello. His interest was as a taxpayer and resident of Jersey City. Mehta claimed Spiniello's bid failed to designate a plumbing subcontractor as required by the bid specifications. JCMUA disagreed, revealing that its professionals found Spiniello's bid was responsive to the specifications. Defendants filed a Rule 4:6-2(e) motion to dismiss in lieu of answer, or, in the alternative, a Rule 4:46 motion for summary judgment.

On June 1, Judge Bariso granted summary judgment to defendants dismissing Mehta's complaint with prejudice. The judge began his legal analysis noting that he would not consider certifications by Mehta's experts because their opinions were not before JCMUA when it decided to award the contract to Spiniello. See Palamar, 196 N.J. Super. at 250. Given his prior decision rejecting Montana's bid as non-responsive, the judge determined that JCMUA did not abuse its discretion in waiving clerical errors in Spiniello's bid, thereby making it the lowest bidder. See Meadowbrook, 138 N.J. at 314; Spina Asphalt Paving Excavating Contractors, Inc. v. Borough of Fairview, 304 N.J. Super.

425, 428-30 (App. Div. 1997); <u>Thomas P. Carney, Inc. v. City of Trenton</u>, 235 N.J. Super. 372, 381 (App. Div. 1988); <u>Pub. Constructors, Inc. v. N.J. Expressway Auth.</u>, 43 N.J. 545, 546-548 (1965).

Next, the judge determined that Spiniello's bid was the lowest responsive bid. He rejected Mehta's argument that Spiniello's bid was non-responsive because it did not list its subcontractors. The judge noted that the bid specifications' Prefatory Note does not require bidders to list their subcontractors but expressly refers to N.J.S.A. 40A:11-16, which requires that bidders must list subcontractors <u>if</u> they use them and must be read in conjunction with the requirements of N.J.S.A. 40A:11-23.2 that states that bid plans and specifications requiring the listing of subcontractors are mandatory items. The judge then determined the bid specifications did not require bidders to list subcontractors.

As for plumbing subcontractors, the judge looked at Addendum No. 2 of the bid specifications, which indicate that a licensed plumber is possibly needed. The Addendum states:

> SC24.00 Item 24, Allowance for Replacement of Land Services
>
> <u>In the event</u> an existing lead service is encountered during the course of the replacement of water services. This Allowance will cover labor, material, equipment

and profit/overhead that will be required to replace lead services from the valve box to the individual water meter in accordance with EPA and NJDEP Guidelines. <u>This work will be performed on a case by case basis and the Contractor will be provided with the scope of work accordingly</u>.

A licensed plumber is only needed when a lead pipe extends beyond JCMUA's right-of-way. The judge found this work is "purely speculative" because "the bid specifications did not include an identifiable scope" of such work, it would be up to "JCMUA [to] exercise[] its discretion to assign the work on a case-by-case basis." Because "JCMUA opted to provide a uniform allowance to cover this work for all bidders[,]" the judge found "the [b]id [s]pecifications did not require the designation of a plumbing subcontractor."

The judge determined Spiniello's failure to list a plumbing subcontractor for speculative work was not a material deviation from the bid specifications as it did not deprive JCMUA of any assurances that the contract would not be performed in accordance with the bid specifications. Since there was no identifiable scope of plumbing work to be performed and JCMUA would not be performing work beyond its right-of-way, the judge reasoned Spiniello would not need a licensed plumbing subcontractor to perform the contract.

Similarly, the judge rejected Mehta's contention that Spiniello's bid was non-responsive because it failed to list an electrical subcontractor. Declining to consider "Mehta's experts['] [certifications] because it was bound to the record before . . . JCMUA when it awarded the contract[,]" the judge determined it was "speculative [electrical] work pertaining to loop detectors and grounding of water service [and thus] . . . bidders [were not required to] designate an electrical subcontractor." The judge also dismissed as speculative Mehta's contention that a licensed electrician was needed to install a temporary on-site Engineer's Office because it may "already have outlets, fixtures, and wiring to code."[8]

## II.

When reviewing an order granting summary judgment, we apply "the same standard governing the trial court . . . ." Oyola v. Xing Lan Liu, 431 N.J. Super. 493, 497 (App. Div. 2013). A trial court should grant summary judgment when the record reveals "no genuine issue as to any material fact" and "the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The facts are viewed "in the light most favorable to the non-moving party [.]" Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). We accord

---

[8] The judge denied Mehta's motion to stay the order as did this court and our Supreme Court, Mont. Constr. Corp. v. Jersey City Mun. Utils. Auth., 244 N.J. 287 (2020).

no deference to the trial judge's legal conclusions.  Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (citations omitted).  Like the trial court, we must determine whether JCMUA's rejection of Montana's bid as non-responsive was arbitrary, capricious, or unreasonable and that Spiniello had the lowest responsible bid.  See In Re Award of the On-Line Games Prod. & Operation Servs. Cont., 279 N.J. Super. 566, 590 (App. Div. 1995) ("The standard of review on the matter of whether a bid on a local public contract conforms to specifications . . . is whether the decision was arbitrary, unreasonable or capricious.").

A. Due Process Claim

Citing Sellitto v. Cedar Grove Twp., 132 N.J.L 29, 32 (Sup. Ct. 1944), plaintiffs argue JMCUA was obligated to hold a hearing before awarding the contract to Spiniello.  They also contend that under Nachtigall v. N.J. Tpk. Auth., 302 N.J. Super. 123, 143 (App. Div. 1997) and several other earlier decisions, the JCMUA was required to give them "adequate notice, a chance to know opposing evidence, and the opportunity to present evidence and argument in response[.]"[9]

---

[9]  Normally, we would not consider these contentions because they were not raised below.  However, we choose to do so because the public bidding issue involves "a concern matters of great public interest."  Zaman v. Felton, 219 N.J. 199, 226-27 (2014) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

Montana was not entitled to a "plenary quasi-judicial hearing. . . ." Id. at 143; see also Entech Corp. v. City of Newark, 351 N.J. Super. 440, 461 (App. Div. 2002), (holding that a bid protestor was not entitled to a trial-type hearing and that a "challenge to a bid specification need not be so formal" as long as a public entity provides a "fair opportunity" for challenges to be heard, "either before or after a bid award"). Montana was given a fair opportunity to be heard. After receiving Spiniello's bid protest, Montana submitted its opposition to JCMUA. At JCMUA's public meeting, Montana's counsel was given the opportunity to address the body prior to the contract award vote.

## B. Sunshine Law Claim

Plaintiffs argue JCMUA violated the Sunshine Law because its decision and deliberations of the contract award were not made in public but in executive session. They point to Oughton v. Bd. of Fire Comm'rs, Fire Dist. No. 1, Moorestown Twp. Burlington Cnty., 178 N.J. Super. 633, 641 (Law Div. 1980), aff'd in part, rev'd in part, 178 N.J. Super. 565 (App. Div. 1981), which held that N.J.S.A. 10:4-12(b), "requires meetings of public bodies to be open to the public at all times, except in certain designated" instances, anticipated litigation being one of the exceptions. They argue the judge erred in determining that JCMUA could have considered legal issues in executive session as Spiniello's

17

protest and Montana's response did not equate to a legal claim evidencing threatened litigation. We are unpersuaded.

The Sunshine Law provides, "[a] public body may exclude the public only from that portion of a meeting at which the public body discusses any . . . pending or anticipated litigation . . . in which the public body is, or may become, a party . . . ." N.J.S.A. 10:4-12(b)(7) (emphasis added). We have recognized for this exception to apply "the public body must be discussing its strategy in the [pending or anticipated] litigation, the position it will take, the strengths and weaknesses of that position with respect to the litigation, possible settlements of the litigation or some other facet of the litigation itself." Burnett v. Gloucester Cnty. Bd. of Chosen Freeholders, 409 N.J. Super. 219, 236-37 (App. Div. 2009) (quoting Houman v. Pompton Lakes, 155 N.J. Super. 129, 145 (Law Div. 1977)). N.J.S.A. 10:4-12(b)(7) allows a public body to exclude the public to protect any "material covered by . . . the attorney-client privilege and work-product doctrine[,]" Payton v. N.J. Tpk. Auth., 148 N.J. 524, 558 (1997), and "to meet privately with counselors and advisors in order to discuss policy, formulate plans of action and generally to have an exchange of ideas[,]" Burnett, 409 N.J. Super. at 238 (quoting Houman, 155 N.J. Super at 154-55).

Applying these principles, we agree with Judge Bariso's ruling that:

JCMUA did not violate the [Sunshine Law] because no formal action was taken during the [e]xecutive session. [JCMUA's representative] has attested to the fact that no votes were held during the [e]xecutive [s]ession and no straw polls were taken. Rather, after . . . JCMUA finished the deliberations in [e]xecutive [s]ession, the public portion of the meeting resumed . . . . Accordingly, . . . JCMUA did not violate the [Sunshine Law] by meeting in [e]xecutive [s]ession during the April 23, 2020 public meeting.

[(Internal citation omitted).]

JCMUA properly exercised its authority under N.J.S.A. 10:4-12(b)(7) to go into executive session to discuss with its counsel and other professionals Spiniello's bid protest that Montana's low bid should be rejected. It anticipated–and correctly so–that the award of the contract to either Montana or Spiniello would result in litigation by the non-prevailing party. JCMUA did not take formal action rejecting Montana's low bid as non-responsive and awarding the contract to Spiniello until it returned to public session.

C. Dismissal of Plaintiffs' Substantive Claims

Plaintiffs argue that the judge failed to consider facts contrary to JCMUA's position granting summary judgment. They argue the court did not consider their certifications but did consider defendants' certifications. They and UTCA also argue that the court misinterpreted the "pertinent" bid specifications and misapplied relevant law. We disagree.

19

In the context of public bidding, the "function of [the trial c]ourt is to preserve the integrity of the competitive bidding process and to prevent the misapplication of public funds." Marvec Constr. Corp. v. Twp. of Belleville, 254 N.J. Super. 282, 288 (Law Div. 1992); see also Barrick v. State, 218 N.J. 247, 261 (2014); In re Jasper Seating Co., Inc., 406 N.J. Super. 213, 226 (App. Div. 2009). The court could not properly reverse a governmental entity's decision unless the plaintiff demonstrated the decision was "arbitrary, capricious, or unreasonable, or . . . not supported by substantial credible evidence in the record as a whole." Barrick, 218 N.J. at 259 (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).

"[T]he statutory rule in New Jersey is that publicly advertised contracts must be awarded to 'the lowest responsible bidder.'" Meadowbrook, 138 N.J. at 313 (quoting N.J.S.A. 40A:-11:6.1); see also N.J.S.A. 40A:11-4(a). New Jersey's Local Public Contracts Law (LPCL) defines "[l]owest responsible bidder" as the bidder: "(a) whose response to a request for bids offers the lowest price and is responsive; and (b) who is responsible." N.J.S.A. 40A:11-2(27). A bidder is considered the "lowest responsible bidder" if it is the "lowest bidder that complies with the substantive and procedural requirements in the bid

advertisements and specifications." Meadowbrook, 138 N.J. at 313 (citation omitted).

A governmental entity is without authority to award a contract based on a bid containing a material deviation from the bid specifications. Id. at 314; see also Terminal Constr. Corp. v. Atl. Cnty. Sewerage Auth., 67 N.J. 403, 411 (1975). Thus, "a public entity may not waive any material departure from bid specifications or requirements of law, and is bound to reject a non-conforming bid with such defects." Serenity Contracting Grp., Inc. v. Borough of Fort Lee, 306 N.J. Super. 151, 156 (App. Div. 1997).

On the other hand, a governmental entity has discretion to waive non-material deviations—"minor or inconsequential discrepancies and technical omissions"—from the bid specifications. Meadowbrook, 138 N.J. at 314. "[T]o be considered valid," a governmental entity's reasons for accepting or rejecting a bid containing a non-material deviation "must be non-pretextual[,]" "reflect sound business judgment, and may not bespeak any avoidance of the underlying purposes of public bidding requirements." Serenity, 306 N.J. Super. at 157. (citation omitted). Thus, where a bid contains a non-material deviation from the specifications, "the next step is the specific decision to grant or deny waiver [of the deviation,] which is then subject to review under the ordinary abuse of

discretion standard."  On-Line Games Prod., 279 N.J. Super. at 595 (citation omitted).  "If the non-compliance is substantial and thus non-waivable, the inquiry is over because the bid is non-conforming and a non-conforming bid is no bid at all."  Ibid.

The primary issue here is unbalanced unit price bids.  "An unbalanced unit price bid is one where one or more of the items bid does not carry its share of the cost of the work and the contractor's profit."  Armaniaco v. Borough of Cresskill, 62 N.J. Super. 476, 482 (1960).  An example is "a front-end loaded bid [which] contains inflated bid items for work to be completed at the beginning of a contract and subsequent offsetting, understated bid items for work to be completed later in the contract."  M.J. Paquet, Inc. v. N.J. Dep't of Transp. (Paquet II), 171 N.J. 378, 399 (2002).  This type of unbalanced bid poses the

> danger of placing an irresponsible bidder in a position of bidding higher on the earlier work to be done under the contract and lower on the latter work.  Such a bidder could, after having taken his profit out of his early payments on a job, fail to complete the work called for.
>
> [Armaniaco,  62 N.J. Super. at 482.]

The type of unbalanced bid here is not directly related to the timing of the work but is "based on nominal prices for some work and enhanced prices for other work."  Frank Stamato & Co. v. City of New Brunswick, 20 N.J. Super.

340, 344 (App. Div. 1952). The bidder overprices items that could be used in greater quantities than estimated in the proposal, while underpricing those bid items that might be used in significantly lesser quantities. See Boenning v. Brick Twp. Mun. Utils. Auth., 150 N.J. Super. 32, 36-37 (App. Div. 1977). A public risk occurs with this form of unbalanced bidding: post-contract collusion or fraud between the contractor and subcontractors. See id. at 36 (recognizing unbalanced bidding creates a risk of "collusion or fraud between the contractor and the engineer whose discretion will be invoked"). Even absent collusion, where the quantity of an item is uncertain and subject to significant swings, an extremely high unit price for that item, although offset by nominal bids for other items, could present an exceptionally large cost impact, if the highly priced item is required in great quantities. Armaniaco, 62 N.J. Super. at 486-87. The risk is heightened if the contractor has the discretion to allocate the unit-priced items. However, a governmental entity's ability to reject unbalanced bids, prevents the risks to public funds. Ibid.

We are mindful that unbalanced bids are not per se illegal. See Riverland Constr. Co. v. Lombardo Contracting Co., Inc., 154 N.J. Super. 42, 45-48 (App. Div. 1977), aff'd o.b., 76 N.J. 522 (1978). A bid that front-loads costs may be justified by a bidder's need to cover mobilization costs and "general costs of

getting the work started[,]" which are not otherwise included in the bid. Armaniaco, 62 N.J. Super. at 482. A bidder may purposely propose nominal or below-market prices because of a desire to secure a foothold in a market and underbid its competition. Riverland, 154 N.J. Super. at 47.

Nonetheless, an unbalanced bid may be problematic when: (a) nominal bids on some items are offset by excessive bids on others; (b) the unbalanced bid relates to fraud or collusion; or (c) the unbalanced bid undermines fair competition. Ibid. "[T]he submission of unbalanced bids distorts the public bidding process and may make a mockery of fair competition between bidders." Paquet II, 171 N.J. at 400 (internal quotation marks and citation omitted). Although unbalanced bids are not per se illegal, a governmental entity may expressly prohibit them "in the . . . entity's bid specifications or proposal." M.J. Paquet, Inc. v. N.J. Dep't of Transp. (Paquet I), 335 N.J. Super. 130, 139 (App. Div. 2000), aff'd in part, rev'd in part on other grounds, 171 N.J. 378 (2002); see also Armaniaco, 62 N.J. Super. at 487 (stating that a municipality could reserve the right to reject unbalanced bids to guard against the "catastrophe[e]" of greater than anticipated quantities of a high unit-priced item).

In Riverland, the specifications for a sewer construction contract included a "reservation . . . that proposals may be rejected if the prices are obviously

unbalanced." 154 N.J. Super. at 44 (emphasis added). The municipality rejected two low bidders on a contract exceeding $300,000 because the lowest bidder, Lombardo Contracting, bid one cent a cubic yard for fill; and the second lowest bidder, Riverland Construction, bid $1 a cubic yard for fill. "Since the exact amount of fill could not be ascertained in advance of the work, the township sought a unit price based on the engineer's estimate of a required quantity of 8,078 cubic yards." Id. at 45. The engineer estimated that a reasonable cost for fill was $5 per cubic yard. Ibid. The trial court affirmed the rejection of Lombardo but ordered the award to Riverland.

We reversed the trial court's award to Riverland and directed the award to Lombardo as the low bidder. Id. at 48. We noted that the bid for fill was for one of thirty-eight items in the bidders' proposals and consisted of "an item which [was] relatively minor in comparison with the total contract price of over $300,000." Id. at 45, 46. We acknowledged that "a nominal bid under such circumstances is not inherently evil or destructive of fair and competitive bidding[,]" but held that "[t]he pejorative connotation of the phrase 'unbalanced bid' comes into play only when the nominal bid on one item is unbalanced because of an excessive bid on other items, or because of other elements pointing

to fraud, collusion, unfair restriction of competition, or other substantial irregularity." Id. at 46, 47.

Armaniaco involved a taxpayer's challenge to a contract award for construction of a municipal sewer. 62 N.J. Super. at 478. The taxpayer complained that the low bidder's bid was unbalanced, contrary to a specification providing that "[a]ny bid which, in the opinion of the Engineer, is obviously unbalanced, may be rejected." Id. at 479. The plaintiff also complained that the municipality set a fixed price for rock excavation rather than subject it to competitive bidding. Id. at 480.

The successful bidder, D. Stamato & Co. (Stamato) submitted nominal bids for two items—timber sheeting left in place, and well-pointing. Id. at 479-80. It was acknowledged that the actual unit costs were substantial, and Stamato's price was nominal. Id. at 480. Nonetheless, we found no basis to invalidate the bid as unbalanced, on those grounds, as there concededly was no evidence of fraud or collusion, or proof of other substantial irregularity. Id. at 484. In reaching that conclusion, we relied on a similar finding in Frank Stamato & Co. Id. at 482-84.

However, in Armaniaco, we held that the municipality was prohibited from setting a unit price for rock excavation in a municipal sewer. Id. at 485-

86. We recognized that the amount of rock excavation was indeterminate, and the municipality was concerned that unusually high unit bids posed a financial risk to the municipality if greater than expected excavation was required. Id. at 484. We held that the municipality could set a maximum price for the unit. Id. at 487. Alternatively, "it could have reserved, as it did herein, the right to reject unbalanced bids. The rejection of a bid with an extremely high unit rock excavation price would have precluded the feared evil." Ibid.

Applying these principles, we agree with Judge Bariso's finding that the board's rejection of Montana's bid and the award to the Spiniello, the lowest responsible bidder, was not arbitrary, capricious, or unreasonable. Judge Bariso reviewed and considered all the information that was before JCMUA when it made its decision: the bid specifications, the bids submitted by Montana and Spiniello, the bid protests, the responses to bid protests, and the analyses of the protests by JCMUA's professionals. The JCMUA's bid specifications provide that materially unbalanced bids "will be considered unresponsive." This differs from the bid specifications in Riverland, 154 N.J. Super at 44, Armaniaco, 62 N.J. Super. at 479, Frank Stamato & Co., 20 N.J. Super. at 342, which used the more permissive language that an unbalanced bid "may be rejected." Moreover, the extent of nominal bids in two of those cases were minor: In Riverland,

apparently only one category pertaining to a relatively minor item, involved a nominal bid, 154 N.J. Super. at 45-46; in Armaniaco, nominal bids were submitted only for two unit prices, 62 N.J. Super. at 479-80.

As noted above, Judge Bariso clearly set forth in his written decision that Montana's submitted bid was materially unbalanced due to the significant number of nominal bids: fifty-six of the 232-unit price items. JCMUA thus had legitimate concerns that Montana's bid posed a risk that Montana could distort its deployment of equipment and labor, to increase utilization of the high-priced labor categories and increase costs to the Authority.

The judge was correct in rejecting plaintiffs' and UTCA's contentions that Spiniello's bid was non-responsive because they did not list licensed plumbing and electrical subcontractors. The bid specifications expressly stated that bidders did not have to list subcontractors but refers to N.J.S.A. 40A:11-16, which details the requirements when bidders list subcontractors or when a public body requires subcontractors be listed in a bid. Because subcontractors were neither required by the bid specifications nor included in Spiniello's bid, there was no basis for the JCMUA to reject its bid for not listing plumbing and electrical subcontractors. The fact that Allowance Work Item 24 of the bid specifications may involve plumbing work to replace lead pipes does not dictate

28

that a plumbing contractor need be listed in Spiniello's bid because no scope of work was provided in the bid specifications for this uncertainty. And there was no work to be performed under the bid specifications requiring the work of a licensed electrician. The bid requirement to have an Engineers Field Office on-site does not warrant a corresponding requirement to list an electrician contractor to install the office. Moreover, even if Spiniello should have listed an electrical subcontractor, this was a non-material waivable deviation because it did not deprive JCMUA of Spiniello's assurance that it could perform the contract, nor "adversely affect[s] competitive bidding by placing [Spiniello] in a position of advantage over other bidders[.]" River Vale Twp. v. R. J. Longo Constr. Co., 127 N.J. Super. 207, 216 (Law Div. 1974).

In sum, the Authority's rejection of Montana's bid and award of the contract to Spiniello was not arbitrary, capricious, or unreasonable. Consequently, Montana's challenge has no merit.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3730-19